**Shabanali LADHA; Khatoon Ladha; Farzana S. Ladha, Petitioners,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**No. 98–70772.**

United States Court of Appeals, Ninth Circuit.

Submitted Feb. 8, 2000*

Filed June 1, 2000

As Amended June 30, 2000.

---

* The panel finds this case appropriate for submission without oral argument pursuant to Fed. R.App. P. 34(a).

Gary Silbiger, Silbiger & Honig, Los Angeles, California, for the petitioners.

Laura M. Friedman, United States Department of Justice, Office of Immigration Litigation, Washington, D.C., for the respondent.

Before: PREGERSON and WARDLAW, Circuit Judges, and SHADUR, District Judge.\*\*

WARDLAW, Circuit Judge:

Shabanali Ladha ("Mr. Ladha") and Khatoon Ladha ("Mrs. Ladha"), husband and wife, and Farzana Ladha ("Farzana"), their daughter, are Pakistani nationals and citizens. They petition for review of the decision of the Board of Immigration Ap-

peals ("BIA") denying their claims to asylum and withholding of deportation. The ·BIA held that, even assuming that the Ladhas' testimony was credible, they had not met their burden of proof because they failed to provide corroborative evidence of their testimony. The Ladhas also challenge a decision of the Immigration Judge ("IJ") to exclude certain evidence from the immigration hearing. We have jurisdiction,[1] and we hold that the BIA erred as a matter of law in requiring corroborative evidence to support the Ladhas' credible testimony and that the IJ erred as a matter of law in failing to make a record of the evidence. We grant the petition for review, reverse in part, vacate in part, and remand in part.

I.

The background evidence in the record, set forth in a State Department report and in Mr. Ladha's testimony, sets the stage well for the Ladhas' claims. Mr. and Mrs. Ladha were born in Bombay, India, and moved to Karachi, Pakistan, when British India was partitioned. The Ladhas thus belong to the Khoja, or Mohajir,[2] community in Pakistan, which comprises "Pakistanis who emigrated from India at the time of the partition of the subcontinent in 1947, or their direct descendants." Bureau of Democracy, Human Rights and Labor, U.S. Dep't of State, *Pakistan—Profile of Asylum Claims and Country Conditions* 10 (1996) (*"Profile"*). Although Muslim, the Khojas are a small religious minority within Pakistan's Muslim population. "In a population of nearly 132 million people, 77 percent are Sunni Muslims [and] 20 percent Shia Muslims." *Id.* at 7. The Khojas are within the minority Shia branch, and, according to Mr. La-

---

\*\* The Honorable Milton I. Shadur, United States District Judge for the Northern District of Illinois, sitting by designation.

1. Our jurisdiction is under former Immigration and Nationality Act § 106(a), 8 U.S.C. § 1105a(a) (1994), as modified by the transitional rules of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996

("IIRIRA"), Pub.L. No. 104–208, 110 Stat. 3009 (Sept. 30, 1996), as amended by Pub.L. No. 104–302, 110 Stat. 3656 (Oct. 11, 1996).

2. The record suggests that the terms are interchangeable, and the applicants seem to favor the word "Khoja."

dha, the Khoja sect constitutes only about "two to five percent" of the Shia population.

Relations between the Shia and the Sunni are unstable. "While the Shia are well integrated into Pakistani society and occupy responsible positions in society, there have been outbreaks of Sunni–Shia violence from time to time...." *Id.* "Both Sunnis and Shiites have their own social, political and cultural organizations; some of these have been involved in attacks on individuals of the other religious persuasion...." *Id.* Although the government generally responds quickly to such violence, according to the *Profile,* "in Karachi over the last few years ... a serious law and order problem, in part but not exclusively arising from sectarian violence, has developed." *Id.* (noting that "for the first half of 1996, however, Karachi has been relatively quiet.").

Another rift in Pakistani society is between competing violent political organizations. The Mohajir Quami Movement ("MQM") is "a political organization representing the interests of mohajirs." *Id.* at 10. The MQM is split into two wings, which have "tense" relations with one another. *Id.* at 11. "Virtually all Pakistani political parties have armed militants and the MQM is no exception. It should be said also, however, that MQM members have sometimes been the victims of human rights abuses, including the killing of MQM workers, committed by other political party militants." *Id.* at 11.

## II.

In the fall of 1995, the Immigration and Naturalization Service ("INS") charged the Ladhas with being deportable for staying in the United States after their authorization had expired. All three conceded deportability, but sought asylum, withholding of deportation, and in the alternative,

voluntary departure. Although their original application cited other bases for relief under the Immigration and Nationality Act ("INA"), the Ladhas now rely on allegations of political, religious and social-group persecution. *See* 8 U.S.C. § 1101(a)(42)(A) (1994) (listing the bases for refugee status).

At the hearing before the IJ, most of the testimony was from Mr. Ladha, who testified in Urdu. Mr. Ladha testified that he was the chief priest[3] over six Khoja churches in the Karachi area and that his church had 2500–3000 members. He described his duties at the church, testifying that he had been a priest from 1984 to 1990. Mr. Ladha also testified that he supported the MQM. He provided "[m]onitoring or if they needed any help, material-wise," i.e., "[i]f they needed some table, the chair, they wanted to make some arrangements for them for the meetings, I would help them."

As Mr. Ladha relates it, the majority Sunni Muslims "believe that we are not Muslims" and "warn that we should not believe in our practices, our religion." Mr. Ladha describes a pattern of abuse of his church members at the hands of people that he identified as "Suni [sic] fundamentalists and from Jamatay Islam":[4] "when our ladies go to the church to pray and to meditate," these people would "bother the ladies. They abuse them and they do that all the time." When asked for specifics, he stated "When we go to our church in the evening for prayers, it is the time to pray, they come and interfere. They come in like in our way. They touch the ladies. They snatch their purses. They come and block their ways with two escorters."

In July 1988, Mr. Ladha encountered violence at the church. "Some people came to our church and just tried—like they broke the doors, windows, and just

---

3. The words "priest" and "church" were used by Mr. Ladha to describe his religious position and congregation, and so we follow his usage.

4. The meaning of the phrase "Jamatay Islam" is not explained in the record.

tried everything, and we had some speed breakers there to reduce speed and they broke that." Mr. Ladha added that these attackers were the "people from Jamatay Islam and Sunis [sic]." He testified that he came upon the church in the midst of this attack and "[w]hen I tried to talk with them, they slapped me."[5] Mr. Ladha further testified that "[w]e filed a report against those people who broke all of the things against them in the police station right away. Because police was under their influence they did not take any step."

Violence struck another time that year. "[T]he fundamentalists, Suni [sic] Muslims," Mr. Ladha relates, "came to our shops and they beat us up there and we had—and they closed our shutters down and they threatened us, and they said that we should not support the Mohajer Khomy [sic] movement." The group addressed Mr. Ladha "[b]ecause they knew that I was the leader of the church and they knew that if I don't support them that sect or that church will not support these people." "They said that if I stopped the support it would be better for me. Otherwise, they said that we can harm your family."

Mr. Ladha testified that he did not cease his support for MQM, and that in 1990, when Mr. Ladha was not at home, the fundamentalists came to his house and "abused our ladies," including pushing his pregnant daughter-in-law and hitting her "with a rifle butt on her face and there are still marks of that...." Mrs. Ladha was also pushed, and Farzana was present. After this incident, the Ladhas left for the United States because they believed their "lives were in danger." More abstractly, he explained that "[t]he reason ... we left Pakistan is because our—in Pakistan our religion is considered a minorities among minorities." The Ladhas intended to return to Pakistan "if the conditions got

better;" however, Mr. Ladha's brothers have informed him that it is still not safe to return and, except for a brief visit by Mr. Ladha to sell some property, they have not returned. Mr. Ladha testified that his congregation still exists and still is being bothered, and that the person who is the church's priest keeps changing, because the priest is "the target" of the Sunni fundamentalists.

Mrs. Ladha and Farzana testified more briefly and confirmed the main details of Mr. Ladha's account. Farzana indicated that at the attack at their house she was "touched in the wrong places, it was not right" and that the attackers were Sunni Muslims from the Pakistan Peoples Party. She also gave details about her own work as a teacher and aide to her father at the church. She testified that if she returned to Pakistan some people would recognize her as the priest's daughter and that even if not recognized as such, her distinctive dress would identify her as Khoja and cause her to be "considered as a foreigner." Mrs. Ladha likewise confirmed the occurrence of the violence in her home, and described the duties she had at the church.

■ The IJ rejected the Ladhas' asylum and withholding of deportation claims, granting them voluntary departure.[6] The IJ's decision contains a hodgepodge of rationales, some of which, at least, strike us as incorrect. Because the BIA provided de novo review of the record, however, we do not review the decision of the IJ but instead that of the BIA. *See Yepes–Prado v. U.S. INS*, 10 F.3d 1363 (9th Cir.1993) (noting that "any errors made by the IJ will be rendered harmless" by the BIA's de novo review).

Explicitly reserving the question of the Ladhas' credibility, the BIA dismissed their appeal, citing its decisions in *Matter of M–D–*, Interim Decision 3339 (BIA

---

**5.** Mr. Ladha was forced to overcome the inappropriately hostile questioning of the IJ to provide this information.

**6.** He also refused to admit two documents, offered by the Ladhas, into evidence. *See supra* Part IV.

1998) (en banc), *Matter of S–M–J–,* Interim Decision 3303 (BIA 1997) (en banc), and *Matter of Dass,* 20 I. & N. Dec. 120 (BIA 1989). It concluded that the Ladhas failed to meet their "affirmative duty to corroborate, to the degree they can, both their personal circumstances and the general country conditions that frame their asylum claim." The BIA wrote that "[t]he record contains no corroboration of the specific events they describe, nor does it contain evidence that Khojas generally or Khoja clergy specifically are being targeted for harm." Further, "[g]iven the lead respondent's alleged prominence, the particularity of their claim, the broad environment of sectarian violence and abuse they describe, and the time available in which to obtain supporting documentation, it is not unreasonable to expect the respondents to provide more meaningful corroboration or explain their failure to do so," especially "when the record indicates that Khojas continue to practice their faith in Pakistan today, even in the respondents' own mosque."

The Ladhas timely petitioned for review.

### III.

#### A.

 "We review de novo purely legal questions regarding the requirements of the Immigration and Nationality Act ...," *Hartooni v. INS,* 21 F.3d 336, 340 (9th Cir.1994), although the BIA's interpretation of the meaning of the statute is entitled to the deference according to the rules of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See INS v. Aguirre–Aguirre,* 526 U.S. 415, 119 S.Ct. 1439, 1445–46, 143 L.Ed.2d 590 (1999); *INS v. Cardoza–Fonseca,* 480 U.S. 421, 446, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987); *see also Jenkins v. INS,* 108 F.3d 195, 201 (9th Cir.1997) (The court "must give substantial deference to an agency's interpretation of its own regulations." (internal quotation marks omitted)). We do

not, however, explicitly apply the principles of deference to questions already controlled by circuit precedent, because a panel may not reconsider the correctness of an earlier panel's decisions, *see Bonin v. Vasquez,* 999 F.2d 425, 428 (9th Cir.1993), "unless an en banc decision, Supreme Court decision, or subsequent legislation undermines [that] decision[ ]," *Visness v. Contra Costa County (In re Visness),* 57 F.3d 775, 778 (9th Cir.1995) (quoting *United States v. Washington,* 872 F.2d 874, 880 (9th Cir.1989)) (internal quotations omitted).

██ ██ Not only must a panel of this court follow the decisions of previous panels, but also the BIA must follow the decisions of our court. *See Pitcherskaia v. INS,* 118 F.3d 641, 646 (9th Cir.1997) (The BIA "is also bound by our prior decisions interpreting the Act."); *Fisher v. INS,* 79 F.3d 955, 961 (9th Cir.1996) (en banc) (same); *Singh,* 63 F.3d at 1508 ("A federal agency is obligated to follow circuit precedent in cases originating within that circuit.").

"[F]actual findings by the Board regarding asylum or withholding of deportation claims are 'conclusive' if 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.' " *Hartooni,* 21 F.3d at 340 (quoting 8 U.S.C. § 1105a(a)(4)). "We reverse such findings only where the evidence presented by the applicant would compel any reasonable factfinder to reach a contrary result." *Id.* (citing *INS v. Elias–Zacarias,* 502 U.S. 478, 483–84, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992)).

#### B.

██ A "refugee" under section 101(a)(42)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(42)(A) (1994), is generally eligible for asylum in the United States. *See* 8 U.S.C. § 1158(a) (1994). A refugee is an alien who is unwilling to return to his or her country of origin "because of persecution or a well-

founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A) (1994). " 'Persecution' means 'the infliction of suffering or harm upon those who differ ... in a way regarded as offensive.' " *Sangha v. INS*, 103 F.3d 1482, 1487 (9th Cir.1997) (quoting *Sagermark v. INS*, 767 F.2d 645, 649 (9th Cir.1985)). "[P]ersecution cognizable under the Act can emanate from sections of the population that do not accept the laws of the country at issue, sections that the government of that country is either unable or unwilling to control." *Borja v. INS*, 175 F.3d 732, 736 n. 1 (9th Cir.1999) (en banc).

■■■■ "To establish a well-founded fear of persecution, petitioners must show their fear to be both objectively reasonable and subjectively genuine." *Reyes–Guerrero v. INS*, 192 F.3d 1241, 1244 (9th Cir.1999). "An alien satisfies the subjective component by credibly testifying that he genuinely fears persecution." *Duarte de Guinac v. INS*, 179 F.3d 1156, 1159 (9th Cir. 1999). "The objective component can be established in two different ways." *Id.* One way to satisfy the objective component is to prove persecution in the past, giving rise to a rebuttable "presumption that a well-founded fear of future persecution exists." *Id.; see* 8 C.F.R. § 208.13(b)(1)(i) (1999). The second way is to "show a good reason to fear future persecution by adducing credible, direct, and specific evidence in the record of facts that would support a reasonable fear of persecution." *Duarte de Guinac*, 179 F.3d at 1159; *see Reyes–Guerrero*, 192 F.3d at 1244 (stating that the evidence must show "that persecution is a reasonable possibility."). The objective requirement can be met by "either through the production of specific documentary evidence or by credible and persuasive testimony." *Duarte de Guinac*, 179 F.3d at 1159. Even after an alien proves himself or herself to be a

refugee eligible for asylum, the decision to grant asylum is left to the discretion of the Attorney General. *See id.*

■■■■ An alien is entitled to withholding of deportation "if the evidence demonstrates a clear probability that the applicant would be persecuted were he to be deported to his home country." *Id.* He or she must show "more likely than not that he [or she] will be persecuted on account of one of the five enumerated factors were he to return." *Id.* (internal quotation marks omitted). A rebuttable presumption of entitlement to withholding of deportation arises when an applicant shows that he or she "has suffered past persecution such that his life or freedom was threatened in his home country on account of a protected ground." *Id.* at 1164; *see id.* at 1159. The Attorney General has no discretion to deny withholding of deportation to eligible aliens. *See id.* at 1159.

## IV.

The BIA expressly declined to determine whether the Ladhas' testimony was credible. Instead, assuming credibility, the BIA held that the Ladhas' claims failed because they did not provide (or justify the absence of) independent corroboration of facts that the BIA deemed readily susceptible to corroboration. The BIA classifies the Ladhas' supposed failing as not having met their burden of proof. This analysis is legal error.

### A.

■■■■ The Immigration and Nationality Act ("INA") itself does not detail matters of proof on the question of asylum, but the Attorney General has the implicit power to do so, because she is charged with the enforcement of the Act. *See Chevron, U.S.A., Inc.*, 467 U.S. at 843, 104 S.Ct. 2778; 8 U.S.C. § 1103(a) (Supp. II 1996).[7]

7. Arguably, she also has the explicit authority to do so because she is empowered (and required) to establish a procedure for making asylum determinations. *See* 8 U.S.C.

The governing INS regulation in effect at the time of the Ladhas' hearing provided that "[t]he testimony of the applicant, if credible in light of general conditions in the applicant's country of nationality or last habitual residence, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 208.13(a) (1996).[8] The Attorney General has delegated her authority to the BIA to resolve asylum and withholding cases. *See* 8 C.F.R. 3.1(d)(1) (1999) ("Subject to any specific limitation prescribed by this chapter, in considering and determining cases before it as provided in this part the Board shall exercise such discretion and authority conferred upon the Attorney General by law as is appropriate and necessary for the disposition of the case."). In practice, this means the BIA must interpret the law that it is applying to the facts of a case. The BIA has interpreted the law to require, under some circumstances, the corroboration of credible evidence.

In *Matter of S–M–J–*, Interim Decision 3303 (BIA 1997) (en banc), one of the cases relied upon by the BIA in rejecting the Ladhas' claim, the BIA discussed its view of the role of corroborative evidence in assessing applicants' claims. As the BIA sees it, corroborative evidence affects the analysis of both (1) whether testimony is credible and (2) whether credible testimony meets the burden of proof. The BIA wrote:

> Where the record contains general country condition information, and an applicant's claim relies primarily on personal experiences not reasonably

subject to verification, corroborating documentary evidence of the asylum applicant's particular experience is not required. Unreasonable demands are not placed on an asylum applicant to present evidence to corroborate particular experiences (e.g., corroboration from the persecutor). *However, where it is reasonable to expect corroborating evidence for certain alleged facts pertaining to the specifics of an applicant's claim, such evidence should be provided.*

*Matter of S–M–J–*, Interim Decision 3303, at 5–6 (emphasis added); *see id.* at 6 ("[A]n asylum applicant should provide documentary support for material facts which are central to his or her claim and easily subject to verification, such as evidence of his or her place of birth, media accounts of large demonstrations, evidence of a publicly held office, or documentation of medical treatment.").[9]

*Matter of S–M–J–* focused on corroboration through the presentation of *general background evidence*, which it deemed lacking in S–M–J–'s case. In *Matter of MD–*, Interim Decision 3339 (BIA 1998) (en banc), however, the BIA made clear that *S–M–J–*'s rule of corroboration applies to specific allegations as well as general context. *See Matter of M–D–*, Interim Decision 3339, at 4. The BIA concluded that "where an alien's testimony is the only evidence available, it can suffice where the testimony is believable, consistent, and sufficiently detailed to provide a plausible and coherent account of the basis

---

§ 1158(d)(1) (Supp. II 1996). *But cf. Dick v. New York Life Ins. Co.*, 359 U.S. 437, 79 S.Ct. 921, 3 L.Ed.2d 935 (1959) (for *Erie* purposes, burden of proof is not procedural but substantive).

**8.** In the same vein, the current provision states: "The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof [for asylum eligibility] without corroboration." 8 C.F.R. § 208.13(a).

**9.** The BIA apparently intended *Matter of S–M–J–* to clarify its previous holding in *Matter*

of *Mogharrabi*, 19 I. & N. Dec. 439 (BIA 1987) (en banc), in which it wrote:

> Although every effort should be made to obtain ["documentary or other corroborative"] evidence, the lack of such evidence will not necessarily be fatal to the application. The alien's own testimony may in some cases be the only evidence available, and it can suffice where the testimony is believable, consistent, and sufficiently detailed to provide a plausible and coherent account of the basis for his fear.

*Id.* at 445–46.

of the alien's alleged fear," but that "the introduction of such evidence is not 'purely an option' with the asylum applicant; rather, corroborating evidence should be presented where available." *Matter of M–D–,* Interim Decision 3339, at 3–4 (citations omitted). The BIA wrote that "we find it reasonable in this case to expect basic documentation of nationality and identity, as well as confirmation of his or his family's presence at [a] refugee camp," and listed a variety of forms of corroboration that it would expect reasonably could be provided.[10] *Matter of M–D–,* Interim Decision # 3339, at 6. Noting the lack of corroboration (or explanation for its absence), the BIA dismissed *M–D*'s appeal. *See id.*

### B.

We are not free to consider as an open question whether the BIA has hit upon a permissible interpretation of the INA, for the law we must follow is already set out for us: "this court does not require corroborative evidence," *Cordon–Garcia v. INS,* 204 F.3d 985, 992 (9th Cir.2000), from applicants for asylum and withholding of deportation who have testified credibly. "This court recognizes the serious difficulty with which asylum applicants are faced in their attempts to prove persecution, and has adjusted the evidentiary requirements accordingly." *Id.* at 992–93 (citation omitted). Moreover, as we have noted, "[t]hat . . . objective facts are established through credible and persuasive testimony of the applicant does not make those fears less objective." *Aguilera–Cota v. U.S. INS,* 914 F.2d 1375, 1378 (9th Cir.1990) (quoting *Bolanos–Hernandez v. INS,* 767 F.2d 1277, 1285 (9th Cir.1984) (internal quotation marks omitted)). The rule established

in the BIA's cases, and applied to the Ladhas, is unequivocally contrary to the rule in this circuit. *See Singh,* 63 F.3d at 1508 ("A federal agency is obligated to follow circuit precedent in cases originating within that circuit.").

 That the law in this circuit is clear is demonstrated by three lines of cases, each with a different focus, but each reaching the same conclusion. The first line emphasizes the difficulty of proving specific threats by persecutors, and emphasizes that credible testimony as to a threat is sufficient to prove that the threat was made (though further proof that the threat is "serious" may be required before relief is granted). *See, e.g., Lopez–Reyes v. INS,* 79 F.3d 908, 912 (9th Cir.1996) ("[T]he applicant's testimony, if unrefuted and credible, is sufficient to establish the fact that a threat was made."); *Artiga Turcios v. INS,* 829 F.2d 720, 723 (9th Cir.1987) ("The alien is not, however, required to provide independent corroborative evidence of the threats of persecution. An alien's own testimony regarding specific threats can establish a clear probability of persecution, if credible and supported by general documentary evidence that the threats should be considered serious." (citation omitted)); *Bolanos–Hernandez,* 767 F.2d at 1285, 1288 (noting that corroboration is not necessary for an alien's "unrefuted and credible" testimony about the fact of a threat and that "general corroborative evidence, such as documentary evidence, may be most useful" to show that the maker of the threat had "the will or the ability to carry it out" (internal quotation marks omitted) (second alteration in original)). The rationale in these cases for deeming corroboration to be unnecessary

---

**10.** Identified as lacking were (1) documents showing national identity; (2) a corroborative "letter or affidavit" from the alien's sister with whom he is in contact, (3) "any other correspondence or affidavits substantiating the respondent's testimony," (4) "supporting evidence from his family, despite the fact that his sister maintains regular contact with them in the refugee camp"; (5) "evidence of his

former presence at the refugee camp in Senegal, where he claims to have lived for 11 months"; and (6) "evidence confirming his family's presence in the camp, despite the fact that his family has been living there for the past 7 years and continues to reside in the camp." *Matter of M–D–,* Interim Decision 3339, at 4–6.

for credible testimony of a specific threat is that "[a]uthentic refugees rarely are able to offer direct corroboration of specific threats" and that "[p]ersecutors are hardly likely to provide their victims with affidavits attesting to their acts of persecution." *Bolanos–Hernandez,* 767 F.2d at 1285.

A second line of cases emphasizes that not only specific threats but also other facts that serve as the basis for an asylum or withholding claim can be shown by credible testimony alone if corroborative evidence is "unavailable." *See Castillo v. INS,* 951 F.2d 1117, 1121 (9th Cir.1991) ("The objective standard may be satisfied with the applicant's testimony alone if documentary evidence is unavailable."); *Limsico v. U.S. INS,* 951 F.2d 210, 212 (9th Cir.1991) ("Where corroborating documentary evidence is unavailable, an alien's testimony alone will suffice to prove a well-founded fear, but only if it is credible, persuasive, and specific." (internal quotation marks omitted)); *Estrada–Posadas v. U.S. INS,* 924 F.2d 916, 918–19 (9th Cir. 1991) (same); *Aguilera–Cota,* 914 F.2d at 1378 ("Where the evidence is not available, the applicant's testimony will suffice if it is credible, persuasive, and specific."); *Blanco–Comarribas v. INS,* 830 F.2d 1039, 1042–43 (9th Cir.1987) ("[I]f documentary evidence is not available, the applicant's testimony will suffice if it is credible, persuasive, and refers to specific facts that give rise to an inference that the applicant has been or has a good reason to fear that he or she will be singled out for persecution on one of the specified grounds listed in section 208(a)." (internal quotation marks omitted) (alteration in the original)); *Del Valle v. INS,* 776 F.2d 1407, 1411 (9th

Cir.1985) (same); *Cardoza–Fonseca v. U.S. INS,* 767 F.2d 1448, 1453 (9th Cir. 1985) (same), *aff'd,* 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). In none of these cases, however, did the court conclude that credible testimony was insufficient to meet an applicant's burden of proof because corroborative evidence was, in fact, "available." In light of other cases, discussed below, that state the rule without any "availability" limitation, we conclude that this circuit assumes evidence corroborating testimony found to be credible is "unavailable" if not presented.[11]

The breadth of the circuit's rule that corroboration of credible testimony is not necessary can be seen in the third line of cases. These cases make clear that when an alien credibly testifies to certain facts, those facts are deemed true, and the question remaining to be answered becomes whether these facts, and their reasonable inferences, satisfy the elements of the claim for relief. No further corroboration is required. *See Khourassany v. INS,* 208 F.3d 1096, 1100 (9th Cir.2000) ("Because the BIA left the IJ's positive credibility determination undisturbed, we accept Khourassany's testimony as true."); *Yazitchian v. INS,* 207 F.3d 1164, 1168 (9th Cir.2000) ("Because the immigration judge found the Yazitchians' testimony credible, and the BIA did not make a contrary finding, we must accept as undisputed the facts as petitioners testified to them."); *Duarte de Guinac v. INS,* 179 F.3d 1156, 1159 (9th Cir.1999) ("The applicant may make this showing [of an objective well-founded fear of persecution] either through the production of specific documentary evidence or by credible and persuasive testimony."); *Del Carmen Molina v. INS,* 170 F.3d 1247, 1249 & n. 2

---

11. We do not address if or when it is proper to consider the "availability" of corroborating evidence as a basis for an adverse credibility finding; we are concerned only with the body of cases addressing corroboration *after* a finding that an applicant is credible.

(9th Cir.1999) (Because of "the IJ's finding that [petitioner's] testimony was credible, this uncontradicted testimony must be taken as true" and petitioner's "actual, uncontradicted and credible testimony did evidence past persecution."); *Campos–Sanchez v. INS,* 164 F.3d 448, 451 n. 1 (9th Cir.1999) ("[I]f the BIA finds the petitioner credible on remand, it should not require corroborating documents in order to establish his claim of a well-founded fear of persecution. Our cases are clear that such corroboration is encouraged but not required."); *Garrovillas v. INS,* 156 F.3d 1010, 1016 (9th Cir.1998) ("Although Garrovillas provided documentary evidence of his past persecution and his political activities, corroborative evidence is not necessary for a petitioner to establish past persecution."); *Velarde v. INS,* 140 F.3d 1305, 1312 (9th Cir.1998) ("The IJ explicitly found Velarde to be credible and the government failed to produce any evidence against her. As a result, all facts testified to by Velarde must be taken as true."); *Hartooni,* 21 F.3d at 342 (9th Cir.1994) ("Absent an explicit finding that a specific statement by the petitioner is not credible we are required to accept her testimony as true."); *Beltran–Zavala v. INS,* 912

F.2d 1027, 1030 (9th Cir.1990) ("Once credibility has been accorded to Beltran's testimony, corroborative evidence is not required.").[12]

■ We have taken this opportunity to review the extensive and consistent rule on corroboration of our circuit because of the BIA's apparent adherence to an incompatible rule. We reaffirm that an alien's testimony, if unrefuted and credible, direct and specific, is sufficient to establish the facts testified without the need for any corroboration. To the extent that decisions such as *Matter of S–M–J–* and *Matter of M–D–* establish a corroboration requirement for credible testimony, they are disapproved.

### C.

■ Assuming the Ladhas to be credible, as we must in the absence of an explicit finding by the BIA to the contrary, *see Hartooni,* 21 F.3d at 342 (9th Cir. 1994), and applying the governing law of our circuit, we hold that the evidence compels the conclusion that the Ladhas are eligible for asylum on account of religious and political persecution.[13]

12. Some cases use the ambiguous word "may," as in, "his own testimony, if credible, may establish a clear probability of persecution," *Blanco–Lopez v. INS,* 858 F.2d 531, 532 (9th Cir.1988), as does the governing regulation, 8 C.F.R. § 208.13(a) (1999) ("The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration.") In context, we do not understand this usage to mean that sometimes corroboration of credible testimony is necessary to support the facts testified to. Instead, we consider it to indicate that sometimes the facts, credibly testified to and taken therefore to be true, will not cover all elements of the asylum or withholding claim needed to justify relief. *See, e.g. Blanco–Lopez,* 858 F.2d at 532 ("Petitioner is not required to provided independent corroborative evidence of persecution. Rather, his own testimony, if credible, *may* establish a clear probability of persecution." (emphasis added)); *Turcios v. INS,* 821 F.2d 1396, 1402 (9th Cir.1987) ("[A]n alien's unrefuted and credible testimony may be sufficient" to show a clear probability of persecution.).

13. There is no dispute that the Ladhas have exhausted their religious persecution claim. Although the INS argues that the Ladhas' political persecution claim was not exhausted, because the BIA held it to have been waived by not being raised on appeal, we disagree. Although before the BIA the parties do not specifically use the phrase "persecution on account of political opinion," the IJ had specifically considered and rejected the political asylum claim, in part apparently because he found not credible what he described as Mr. Ladha's claim of torture based on his membership in the MQM, and the Ladhas' brief before the BIA challenges this very aspect of the IJ's opinion. The BIA thus had sufficient reason to be aware of, and opportunity to review, this claim, *cf. Sagermark,* 767 F.2d at 648 (9th Cir.1985), and we find that the Ladhas have administratively exhausted it. In contrast, the Ladhas have failed to exhaust their claim to persecution on account of social group, by failing to make reference to the relevant claim before the BIA, leaving us without jurisdiction to consider the claim on judicial review. *See Vargas,* 831 F.2d at 908.

Assuming the Ladhas' credibility, they have satisfied the subjective component of the test for asylum eligibility. *See Duarte de Guinac,* 179 F.3d at 1159 ("An alien satisfies the subjective component by credibly testifying that he genuinely fears persecution."). On the objective side of the analysis, the record shows the Ladhas to have presented compelling proof of past persecution. *See id.* As noted above, the record contains background evidence of religious and political violence, and reveals that, at least in Karachi in what seems to be the relevant period, the government was not able to control the violence. They further testified to a general harassment of the members of their church. Having provided that background context, the Ladhas testified to three incidents of physical violence and threats against them, at the hands of Sunni fundamentalists, on account of the Ladhas' related religious and political beliefs: (i) in their church, which was attacked and in which Mr. Ladha was slapped; (ii) at the "shops" where, as Mr. Ladha testified, "they beat us up threatened us, and they said that we should not support the Mohajer Khomy [sic] movement"; and (iii) in their home, where invaders assaulted Mr. Ladhas' family. Mr. Ladha testified to his support for the MQM party. He made clear that, at least during the attack at the shops, the reason he was specifically targeted was his position as a church leader: the attackers spoke to him "[b]ecause they knew that I was the leader of the church and they knew that if I don't support them that sect or that church will not support these people," and "[t]hey said that if I stopped the support it would be better for me. Otherwise, they said that we can harm your family." These facts compel a finding of past persecution on account of political and religious opinion. Therefore, a rebuttable presumption arises of a well-founded fear of future persecution. This presumption was not rebutted by evidence in the record; indeed, the State Department *Profile* provides country conditions information *supporting* the claims of the Ladhas. In addition, Farzana specifically testified that despite a recent change in political power, part of the hostile Sunni party was still in power. We conclude that the record compels the conclusion that the INS has not rebutted the presumption by a preponderance of the evidence, *see Duarte de Guinac,* 179 F.3d at 1159, through "individualized analysis of how changed conditions will affect the specific petitioner's situation," *Borja,* 175 F.3d at 738 (quoting *Garrovillas,* 156 F.3d at 1017 (internal quotation marks omitted)).

■ With regard to withholding of deportation, we conclude that the evidence may not compel, but certainly does not prohibit, a finding that the Ladhas have met their burden of proof. Although, as noted above, the record compels a conclusion of past persecution, a reasonable factfinder might not be compelled to find that the past persecution carried the threat of death or imprisonment. *See Duarte de Guinac,* 179 F.3d at 1164 (noting that a presumption of entitlement to withholding of deportation arises if the applicant has shown past persecution "such that his life or freedom was threatened in his home country on account of a protected ground."). Moreover, the evidence in the record focusing on the future likelihood of persecution may also not compel the conclusion that "more likely than not" the future persecution would occur. On the other hand, "[a] key factor in finding evidence sufficient for withholding of deportation is whether the harm or threats of harm were aimed against the petitioner specifically." *Chanchavac v. INS,* 207 F.3d 584 (9th Cir.2000) (finding that Chanchavac was entitled to withholding of de-

portation because "[t]he military targeted Chanchavac specifically when it broke into his home, beat and interrogated him, and copied down his name") (quoting *Vilorio–Lopez v. INS*, 852 F.2d 1137, 1141 (9th Cir.1988) (emphasis added)) (internal quotation marks omitted). Because the "compelling" nature of this evidence is a close call, and because the BIA applied the wrong legal standard to the evidence on its first assessment, we remand for the BIA to reassess the withholding of deportation claim under proper standard.

### D.

Because we reverse the BIA's conclusion as to the objective component of the asylum decision, and because the BIA "expressly declined to rule on the issue" of credibility, we remand the case for findings as to credibility. *Briones v. INS*, 175 F.3d 727, 730 (9th Cir.1999) (en banc). If the BIA determines that the Ladhas testified credibly under Ninth Circuit law, then the Attorney General shall exercise her discretion and determine whether to grant asylum. We also remand for the BIA to determine whether the Ladhas have shown an entitlement to withholding of deportation.

### V.

Because we are remanding for factual determinations, we must address the Ladhas's challenge to the IJ's evidentiary exclusion of two proffered documents.

### A.

■■■ A preliminary question is whether the Ladhas exhausted administrative remedies on this issue. *See* 8 U.S.C. § 1105a(c) (1994) ("An order of deportation or of exclusion shall not be reviewed by any court if the alien has not exhausted the administrative remedies available to him as of right under the immigration laws and regulations...."). Although they urged the admissibility of the evidence at the deportation hearing and raised the issue in their notices of appeal to the BIA,

the Ladhas did not discuss it in their briefs before the BIA. Nonetheless, our opinion in *Vargas v. U.S. Dept. of Immigration and Naturalization*, 831 F.2d 906 (9th Cir. 1987), suggests that they have satisfied the exhaustion requirement. In *Vargas*, we found that the petitioner had failed to exhaust his administrative remedies on the claim that a record of conviction, introduced at the deportation hearing, was inaccurate. We observed that:

> At the deportation hearing Vargas objected to the complaint portion of the record on hearsay grounds and specifically stated that he had "no problem with the conviction record itself." Moreover, Vargas failed to file a brief with the BIA and his notice of appeal to the BIA only challenged the IJ's discretionary decision to deny him a waiver of deportation.

*Vargas*, 831 F.2d at 908 (footnote omitted) ("Had Vargas brought his due process claim before the IJ or BIA, the descriptive error in the conviction record could have been corrected. However, because Vargas failed to do this, he did not exhaust his administrative remedies."). Unlike Vargas, the Ladhas both raised the issue of the admissibility of this evidence on the record before the IJ and further raised the issue in their notice of appeal to the BIA. Notices of appeal are filed directly with the BIA, *see* 8 C.F.R. § 3.3(a) (1999), and the regulations specifically contemplate that supporting briefs are not required to be filed by a party, *see* 8 C.F.R. § 3.38(f) (1999) ("Briefs *may* be filed by both parties ...." (emphasis added)); therefore, the notice of appeal is of great importance in raising claims before the BIA. Because the BIA conducted a de novo review of the record in this case, we conclude that it had "a full opportunity to resolve [the] controversy or correct its own errors before judicial intervention," *Sagermark v. INS*, 767 F.2d 645, 648 (9th Cir.1985), and that therefore the claim was exhausted.

### B.

■■■ Under the Fifth Amendment's Due Process Clause, "an alien who faces

deportation is entitled to a full and fair hearing of his claims and a reasonable opportunity to present evidence on his behalf." *Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir.2000). "[I]f the proceeding was 'so fundamentally unfair that the alien was prevented from reasonably presenting his case,'" and if the alien shows prejudice from this unfairness, we will reverse the BIA's decision. *See Lata v. INS*, 204 F.3d 1241, 1246 (9th Cir.2000) ("To prevail on a due process challenge to deportation proceedings, Lata must show error and substantial prejudice"); *see also Espinoza v. INS*, 45 F.3d 308, 310, 311 (9th Cir.1995) (noting that "[t]he sole test for admission of evidence is whether the evidence is probative and its admission is fundamentally fair" and holding that the refusal to allow cross-examination of the preparer of an INS form did not justify relief where it would not have affected the outcome); *cf. Trias–Hernandez v. INS*, 528 F.2d 366 (9th Cir.1975) (probative documentary evidence, admitted without the presence of the author at trial, was not "so fundamentally unfair so as to violate due process"). In addition to the Due Process Clause, statutes and regulations grant the alien a right to present evidence. *See, e.g.,* 8 U.S.C. § 1252(b)(3) (1994) (pre-IIRIRA provision of the INA stating that in a deportation hearing "the alien shall have a reasonable opportunity to examine the evidence against him, to present evidence on

his own behalf, and to cross-examine witnesses presented by the Government").[14] "When these protections are denied, and such denial results in prejudice, the constitutional guarantee of due process has been denied." *Jacinto v. INS*, 208 F.3d 725, 728 (9th Cir.2000).

Before we are able to determine whether the exclusion of proffered evidence has rendered an immigration hearing fundamentally unfair or violated the statute or regulations with resultant prejudice, we must have before us a sufficient description of the excluded evidence. If an IJ excludes a document without either entering the document into the record for the purposes of identification or describing the document's content orally and on the record, we have no adequate way of reviewing the IJ's decision.[15] In other related contexts, we have made clear that the BIA must provide reasons for its actions sufficient to allow for judicial review. *See Stoyanov v. INS*, 172 F.3d 731, 735 (9th Cir.1999) ("In order for this court to conduct a proper substantial evidence review of the BIA's decision, the Board's opinion must state with sufficient particularity and clarity the reasons for denial of asylum." (internal quotation marks omitted)); *Velarde*, 140 F.3d at 1310 (9th Cir.1998) ("Failure by the BIA 'to support its conclusions [denying relief] with a reasoned explanation based on legitimate concerns'

---

**14.** The current, post-IIRIRA, provisions are similar. *See, e.g.,* 8 U.S.C. § 1229a(b)(4)(B) (Supp. II 1996) ("[T]he alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses presented by the Government....").

**15.** Even if the parties could supplement the record on the petition for review, *compare Fisher*, 79 F.3d at 963 (concluding that the court is not permitted to take judicial notice of materials not in the administrative record), *with Colmenar*, 210 F.3d 967, 972 n. 5 (9th

Cir.2000) ("Although we believe that a petitioner is entitled to present evidence outside the record in order to show that he was prejudiced by the lack of a full and fair hearing, we can find no cases in which we have stated this proposition explicitly. Therefore, we are especially reluctant to penalize Colmenar for failing to explain exactly what evidence he would have presented below if given the change."), this method would have a number of severe disadvantages, including depriving us of a meaningful review by the BIA of the IJ's decision.

... constitutes an abuse of discretion.") (quoting *Vargas,* 831 F.2d at 908) (bracketed alteration in original); *Ghaly v. INS,* 58 F.3d 1425, 1430 (9th Cir.1995) (requiring that "the Board provide a comprehensible reason for its decision sufficient for us to conduct our review and to be assured the petitioner's case received individualized attention"); *Castillo v. INS,* 951 F.2d 1117, 1121 (9th Cir.1991) ("Boilerplate opinions, which set out general legal standards yet are devoid of statements that evidence an individualized review of the petitioner's contentions and circumstances, neither afford the petitioner the BIA review to which he or she is entitled, nor do they provide an adequate basis for this court to conduct its review.").

 We therefore hold that a decision of the BIA or IJ under review in this court must contain a sufficient indication of the content of excluded evidence to allow us to review the exclusion for fundamental fairness. Any other conclusion would be nonsensical in the face of the constitutional, statutory, and regulatory regime allowing for an asylum applicant to offer evidence and the right of judicial review of final orders of deportation. *See Chevron U.S.A. Inc.,* 467 U.S. at 842–43, 104 S.Ct. 2778 ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").[16]

 The IJ's decision in this case failed to meet this standard. The IJ excluded a letter from Mr. Ladha's brother and a document from Mr. Ladha's church. The letter from the brother was apparently written in 1996. The IJ rejected the letter as "totally self-serving and not admissible and not worthy of any evidence or value, whatsoever," at least in part because it was not written contemporaneously with the events it described. The second document, described in the transcript as a notarized copy of a church document written in 1984, was also rejected, apparently because the IJ did not have confidence in the notarization and also felt the documents were "self-serving," although the IJ's explanation is particularly unclear on the precise ground for finding this document inadmissible.[17] Aside from these facts, the IJ revealed nothing of substance about the documents. The IJ did not identify their content during his colloquy with counsel nor in his oral decision to exclude the documents. Moreover, the IJ did not enter the documents into the record for the purposes of identification.[18] We are thus left, on this record, with no means of reviewing the IJ's decision to exclude evidence.

Therefore, on remand we instruct the BIA to clarify the record with regard to the excluded evidence or to remand to the IJ for such clarification. *See Castillo,* 951 F.2d at 1121 ("Those Board opinions that lack an adequate statement of the BIA's reasons for denying the petitioner relief must be remanded to the Board for clarification of the bases for its opinion.").

## VI.

For the foregoing reasons, we GRANT the petition for review, REVERSE the BIA's determination as to the objective component of asylum eligibility, VACATE the BIA's determination as to withholding

16. Moreover, this conclusion is consistent with the statute providing that "a complete record shall be kept of all testimony and evidence produced at the proceeding." 8 U.S.C. § 1229a(b)(4)(C) (Supp. II 1996).

17. Although on this inadequate record we cannot assess the propriety of the IJ's decision, we note that excluding documents for being "self-serving" is not a sound practice. *Cf. Murphy v. INS,* 54 F.3d 605, 612 (9th Cir.1995) ("Testimony should not be disregarded merely because it is uncorroborated and in the individual's own interest.").

18. Our review shows nothing in the record that appears to correspond to the excluded letter; although a document in the record may be the excluded church document, we cannot be certain.

of deportation, and REMAND the case for further proceedings.