**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ABDIRISAQ HASSAN ADEN,
                    *Petitioner,*

            v.

ERIC H. HOLDER, JR., Attorney
General,
                    *Respondent.*

No. 08-71168

Agency No.
A088-515-143

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
February 12, 2009—Pasadena, California

Filed December 18, 2009

Before: Andrew J. Kleinfeld, Carlos T. Bea and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Kleinfeld

16631

## COUNSEL

Victoria Diaz, Ruben Aranda, Linda Imonode, and Mark Sorokin, law students from the University of Arizona College

of Law, supervised by Willie M. Jordan-Curtis, Assistant Dean for Student Affairs and Associate Dean for Student Affairs, University of Arizona College of Law, Tucson, Arizona, for the petitioner.

Gregory G. Katsas, Stephen J. Flynn, Mark C. Walters, Department of Justice, Washington, DC, for the respondent.

## OPINION

KLEINFELD, Circuit Judge:

We address corroboration in this asylum case under the REAL ID Act.

### Facts

Abdirisaq Hassan Aden entered the United States from Mexico at the San Ysidro, California, port of entry. He conceded removability and, with the help of counsel, applied for asylum. He presented himself as a Somalian from a minority clan who feared persecution from the two dominant clans.

His account of Somalian life is horrific. He testified that he is from the Bilisyar (or Biliser) subclan of the Wardey clan, though he also stated that the name of his clan was Warduy-Ali or Madaheweyne. In 2003, when Hassan was fourteen, Hawiye men invaded the family home, and while he hid under the bed, they raped one of his sisters and abducted a woman who was visiting. The Hawiye men got Hassan Aden out from under the bed, pointed a gun at him and threatened to kill him, and beat him with a metal pole. Another time, Hawiye men accused him of spying for the Darod clan and beat him into unconsciousness. The Hawiye beat him again at a Hawiye militia checkpoint when he could not come up with a sufficient bribe.

Three of Hassan Aden's brothers (he had ten siblings and seven half-siblings) were killed, one by a bomb, one accused by Hawiye men of spying for the Darod, one at a Hawiye militia checkpoint. Hassan Aden and his father decided that he should leave Somalia, though Hassan Aden's family and also his wife remain there. His father sold eight of his fifteen cows and paid $4,180 to a Hawiye smuggler who got him out of Mogadishu to Dubai, then Mexico, where he came across the U.S. border.

The Immigration Judge was skeptical of Hassan Aden's account. He doubted that Hassan Aden was the impoverished illiterate from a mud hut that he testified he was because photographs found in Hassan Aden's possession showed him looking affluent in clothes that would go fine in America, and one showed him with a book with English on the cover, in which Hassan Aden testified that he wrote accounts when he traveled to the village to sell the family's produce. (Hassan Aden explained that his father wrote the words, he could read but not write words, and he wrote only numbers.) Hassan Aden also testified that he learned English by watching movies on video cassette, which added to the IJ's suspicion that Hassan Aden's family was not poor as he claimed.

The IJ doubted that Hassan Aden was as bereft of English as he said for another reason, that he sometimes answered the questions before the translator translated them. Importantly, as relates to Hassan Aden's asylum claim, the IJ was skeptical of Hassan Aden's story that he hid but was found, and that all the men in his family ran away leaving the women to the Hawiye.

Most centrally, the IJ doubted that there was such a clan as the Bilisyar or Wardey, because none of the country materials produced by either side mentioned either name, and he doubted that Hassan Aden was a member of the claimed clan. Hassan Aden's claim for asylum was that he was persecuted on account of being a member of the Bilisyar subclan of the

Wardey clan. Because of his doubts, the IJ continued the hearing and requested that Hassan Aden produce corroboration regarding existence of the clan and Hassan Aden's membership in it. At the resumed hearing, Hassan Aden produced three things that he said he had obtained by calling the Somali community in San Diego, which in turn contacted the Somali community in Minneapolis. All three are unsworn documents from Minneapolis labeled "affidavit," one saying that Abdirisaq "Hussein Adan" was a member of the Wardaa clan, the other two saying that they had personal knowledge of the Wardey-Ali clan and the Bilisyar subclan, because they had lived in the Lower Juba region near Goobweyo (where Hassan Aden had testified he was from). The IJ remained unsatisfied, because none of the three writers claimed to know Hassan Aden and no anthropological or other country evidence from scholarly sources was produced to show that the Bilisyar or Wardey clans actually existed.

The IJ denied Hassan Aden's application for asylum and withholding of removal under the Convention Against Torture. The IJ specifically declined to make any adverse credibility determination, but held that Hassan Aden's failure to produce adequate corroboration for his statements of clan membership undermined his application for asylum.

Hassan Aden appealed to the Board of Immigration Appeals, arguing that the IJ erred in denying his application because he gave "ample testimony" regarding his well-founded fears of persecution in Somalia, and that his testimony and other documentation were sufficient to demonstrate his eligibility for asylum. He argued that the IJ had no basis on which to doubt his credibility, contending that flaws in translation contributed to the IJ's perception of inconsistencies in his testimony.

The BIA wrote its own decision, and did not adopt the IJ's decision. The BIA held that there was no clear error in the IJ's findings of fact, "including his assessment of the respondent's

claim to his identity as a member of a minority clan in Somalia." The BIA wrote that "[w]hile the respondent presented voluminous evidence regarding the clan structure of Somalia, he failed to provide any credible corroborating evidence, such as scholarly sources, ethnological studies, or witnesses, showing the existence of the alleged Bilisyar and/or Wardey-Ali clans in Somalia." The BIA found "no error in the Immigration Judge's decision to give little weight to the affidavits . . . where the affidavits were in fact inconsistent with each other." Regarding Hassan Aden's claim of prejudicial translation error, the BIA said that he "failed to cite to any alleged errors in translation and/or explained how they would have affected the outcome of his proceedings."

## Analysis

Because the BIA wrote its own decision and did not adopt the IJ's decision. we review the BIA decision only, not the IJ's decision.[1]

I.   Requirement of Corroboration.

The main issue in this case is corroboration. Hassan Aden's claim for asylum is that he was persecuted on account of being a member of the Bilisyar subclan of the Wardey clan. He offered his testimony as proof. The BIA did not find that Hassan Aden was not credible, nor did it find that he was. It concluded that he had not borne his burden of proof because he had failed to provide sufficient corroboration. The IJ recessed and continued his hearing so that he could provide corroboration, so there is no issue whether he should have been given notice of his need for it and time to provide it. He provided three "affidavits." An affidavit is a sworn declaration,[2] and the three documents were not sworn, so though labeled affidavits, they are properly characterized as letters. The BIA

---

[1]*Simeonov v. Ashcroft*, 371 F.3d 532, 535 (9th Cir. 2004).

[2]Black's Law Dictionary 66 (9th ed. 2009).

wanted something more, such as "scholarly sources, ethnolog- ical studies, or witnesses."

**[1]** We have a line of circuit authority for the proposition that corroboration cannot be required from an applicant who testifies credibly. In *Ladha v. INS*, we "reaffirmed that an alien's testimony, if unrefuted and credible, direct and spe- cific, is sufficient to establish the facts testified without the need for any corroboration."[3] *Kataria v. INS* relied on *Ladha* in stating that "the BIA may not require independent corrobo- rative evidence from an asylum applicant who testifies credi- bly in support of his application."[4] *Kataria* stated that "we must accept an applicant's testimony as true in the absence of an explicit adverse credibility finding."[5]

**[2]** Congress abrogated these holdings in the REAL ID Act of 2005.[6] The statute says that the applicant's credible testi- mony "may" be sufficient without corroboration, but the trier of fact may require corroboration (unless not reasonably obtainable) even for "otherwise credible testimony"[7]:

> The testimony of an applicant may be sufficient to sustain the applicant's burden without corroboration, but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee. In determining whether the applicant has met the applicant's burden, the trier of fact may weigh the credible testimony along with other evidence of record. Where the trier of fact determines that the applicant should provide

---

[3]*Ladha v. I.N.S.*, 215 F.3d 889, 901 (9th Cir. 2000).

[4]*Kataria v. I.N.S.*, 232 F.3d 1107, 1113 (9th Cir. 2000).

[5]*Id.*

[6]Pub. L. 109-13, 119 Stat. 231 (2005). Hassan Aden applied for asylum after May 11, 2005, the effective date of the statutory changes.

[7]8 U.S.C. § 1158(b)(1)(B)(ii).

evidence that corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence.[8]

Thus the law on corroboration is different now from what it was when we decided *Kataria* and *Ladha*. The statutory phrase "may be sufficient to sustain the applicant's burden without corroboration" implies that the testimony also may not be sufficient. The phrase "but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee" means that there are three prerequisites before uncorroborated testimony may be considered sufficient: (1) the applicant's testimony is credible; (2) the applicant's testimony is persuasive; and (3) the applicant's testimony refers to facts sufficient to demonstrate refugee status. Credible testimony is not by itself enough. Otherwise the other two requirements would be mere surplusage.[9]

[3] The statute additionally restricts the effect of apparently credible testimony by specifying that the IJ need not accept such testimony as true. The statute provides that the IJ may, in determining whether it satisfies the applicant's burden of proof, "weigh the credible testimony along with other evidence of record."[10] For example, if, hypothetically, the IJ said "you seem like an honest person, but the country report says that the Wardey clan is treated with great respect and never hindered in any way by the Darod and Hawiye clans," he

---

[8]*Id.*

[9]*See Exxon Corp. v. Hunt*, 475 U.S. 355, 369 (1986) (rejecting the reading of a phrase that made a latter phrase surplusage); *United States v. Wenner*, 351 F.3d 969, 975 (9th Cir. 2003) (recognizing the same canon of statutory construction); 2A Norman J. Singer, Sutherland Statutory Construction § 46:06, at 181-94 (6th ed. 2000).

[10]8 U.S.C. § 1158(b)(1)(B)(ii).

would weigh persuasiveness in light of the whole record including such evidence.

**[4]** The last sentence of the provision deals with inherent difficulty in providing corroborating evidence from a foreign country, especially if, as is often the case, the country is in turmoil and the applicant is from a disfavored group or the corroboration would have to be from his persecutors. Corroborating evidence "must" be provided where the trier of fact determines that it should be, "unless the applicant does not have the evidence and cannot reasonably obtain the evidence."[11] This means that an applicant cannot be turned down solely because he fails to provide evidence corroborating his testimony, where he does not have and cannot reasonably obtain the corroboration. But it also means that he can be turned down for failing to provide corroboration where he does have it or could reasonably obtain it.

**[5]** Congress has thus swept away our doctrine that "when an alien credibly testifies to certain facts, those facts are deemed true."[12] Apparently honest people may not always be telling the truth, apparently dishonest people may be telling the absolute truth, and truthful people may be honestly mistaken or relying on unreliable evidence or inference themselves. Congress has installed a bias toward corroboration in the statute to provide greater reliability. This is not very different from other litigation. In the most routine personal injury case, when a plaintiff credibly testifies that the collision caused $10,000 worth of damage to his car, $5,000 in medical expenses, and $10,000 in wage loss, the jury is likely to reject and is free to reject his damages testimony unless it sees the body shop invoice, the medical bills, and documentary evi-

---

[11]*Id.*

[12]*Ladha v. I.N.S.*, 215 F.3d 889, 900 (9th Cir. 2000).

dence of wage loss. Congress thus made asylum litigation a little more like other litigation.[13]

Our sister circuits construe the new provision on corroboration as we do.[14]

II.   Sufficiency of corroboration.

Hassan Aden argues alternatively that even if corroboration was properly required (as we hold), the corroboration he provided sufficed. The BIA, as Hassan Aden correctly argues, merely assumes that there may be scholarly sources that mention the Wardey clan and the Bilisyar subclan if they exist. This argument is a little slippery. If there were such scholarly

---

[13]Consider jury instructions for civil cases:

### § 104.25 Failure to Call Available Witness

If a party fails to call a person as a witness who has knowledge about the facts in issue, and who is reasonably available to the party, and who is not equally available to the other party, then you may infer that the testimony of that person is unfavorable to the party who could have called the witness and did not.

### § 104.26 Failure to Produce Available Evidence

If a party fails to produce evidence that is under that party's control and reasonably available to that party and not reasonably available to the adverse party, then you may infer that the evidence is unfavorable to the party who could have produced it and did not.

O'Malley, Grenig, Lee, Federal Jury Practice and Instruction, Civil, Vol. 3, at 149-50 (5th ed. 2000). It is hard to imagine a civil trial in which the party bearing the burden of proof asked the trier of fact to take his uncorroborated word for a proposition reasonably subject to corroboration.

[14]*See Balachandran v. Holder*, 566 F.3d 269, 273 (1st Cir. 2009); *Sandie v. Attorney Gen.*, 562 F.3d 246, 252 (3d Cir. 2009); *Lin v. Holder*, 565 F.3d 971, 976-77 (6th Cir. 2009); *Krishnapillai v. Holder*, 563 F.3d 606, 618 (7th Cir. 2009); cf. *Liu v. Holder*, 575 F.3d 193, 197 (2d Cir. 2009) (noting the statutory change but not construing it because the case reviewed an asylum application that predated the effective date of the statutory change).

materials, then they would corroborate Hassan Aden, but if there are not, then it would be impossible to prove that the clan and subclan exist. The BIA's statement invites the objection that the half day hearings by impecunious petitioners typical of asylum cases should not be burdened with expensive expert witnesses testifying about their searches of the academic literature and their opinions about it. Fortunately the BIA did not require such academic or expert testimony or documentation. It merely suggested it as a possibility, along with "witnesses."

Hassan Aden argues that he did provide witnesses, the three "affidavits." The three letters (they are unsworn) were given "little weight" by the BIA because the writers did not know Hassan Aden and were "inconsistent." The BIA's explanation is vulnerable to criticism. After all, someone from the Lower Juba region may know very well that the clan and subclan exist, which was the point, without having any acquaintance with Hassan Aden or his family. But one of the letters does indeed say that "Abdirisaq Hussein Adan" is a member of the "Wardaa" clan, something the writer could not know without some foundation in knowledge of petitioner, a knowledge neither claimed nor consistent with misspelling two of petitioner's three names.

**[6]** Considering that the country report, and not only petitioner's testimony, establishes that Somalia is a violently disorderly place with no established state, inability to obtain documentation from Somalia might be quite credible, had Hassan Aden testified (he did not) that he wrote or emailed his family but the system of communication did not work and he had no idea whether his communications or theirs got through. A reasonable finder of fact might deem sufficient for corroboration the two identical letters saying that the writers had resided in the Lower Juba region, and the Wardey-Ali clan and Bilisyar subclan were minorities who lived there. Our standard of review, though, does not enable us to substitute our judgment about the persuasiveness of this corrobora-

tion for the BIA's. We are required to accept administrative findings of fact "unless any reasonable administrator would be compelled to conclude to the contrary."**15** This standard also applies to the IJ's determinations "with respect to the availability of corroborating evidence."**16** Even if we might conclude to the contrary regarding sufficiency of corroboration, we cannot say that "any reasonable adjudicator would be compelled to conclude to the contrary."**17** The highly deferential standard of review compels us to let stand the BIA's determination that Hassan Aden's corroboration was insufficient. Thought the three letters support the conclusion that Hassan Aden's claimed clan and subclan exist, the law is that "[t]o reverse the BIA finding we must find that the evidence not only *supports* that conclusion, but *compels* it."**18** The question is close, but in light of the other evidence in the record casting doubt on Hassan Aden's story, we cannot say that the letters "compel" that conclusion.

## III.   Translation.

**[7]** Hassan Aden argues that he was denied due process of law because his credibility was thrown into doubt by erroneous translation. The examples he points to are that the translator said "jungle" but he did not describe his area as "jungle," and he said he had never attended school but the translator presented this as though he had said he had no education. The former was irrelevant, and the latter was cleared up by further questioning. Also, the IJ noted that Hassan Aden responded to several questions before they were translated, indicating that he was not entirely reliant on the translator. Difficulties arise in communication between people who do not speak each others' languages, but Hassan Aden has not demonstrated any prejudice from the claimed translation errors. To

---

**15**8 U.S.C. § 1252(b)(4)(B).

**16***Id.* § 1252(b)(4).

**17***Id.* § 1252(b)(4)(B).

**18***I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992).

establish a due process violation, a petitioner must show that defects in translation prejudiced the outcome of the hearing.[19]

## IV. Torture.

Hassan Aden argues in his brief to us that he is entitled to relief under the Convention Against Torture.[20] His brief to the BIA, though, argued only credibility, clan identity, and persecution. The government asserts that we lack jurisdiction over this claim because Hassan Aden failed to exhaust the issue before the BIA. Hassan Aden did not include the Convention Against Torture in his Notice of Appeal to the BIA, nor did he argue the issue in his brief before the BIA. However, he stated in the conclusion of his briefing that the IJ erred by "denying his application for asylum, holding him ineligible for withholding of removal, and denying him the protections afforded under the Convention Against Torture."

In *Zhang v. Ashcroft*, we address similar circumstances in which a petitioner merely "mentioned in his brief to the BIA that he was requesting reversal of the IJ's denial of relief under the Convention Against Torture," but failed to brief that topic at any length.[21] We held that this mention was "sufficient to put the BIA on notice that [the petitioner] was challenging the IJ's Convention determination, and [gave] the agency . . . an opportunity to pass on this issue."[22] Here, as in *Zhang*, the petitioner mentioned his Convention Against Torture claim in his brief to the BIA. Accordingly, Hassan Aden adequately exhausted his claim before the BIA, and we have jurisdiction to address that claim on appeal.

---

[19]*Acewicz v. I.N.S.*, 984 F.2d 1056, 1063 (9th Cir. 1993).

[20]8 C.F.R. § 1208.16(c).

[21]*Zhang v. Ashcroft*, 388 F.3d 713, 721 (9th Cir. 2004).

[22]*Id.*; *accord Kaganovich v. Gonzales*, 470 F.3d 894, 897 (9th Cir. 2006).

**[8]** To be eligible for withholding of removal based on the Convention Against Torture, Hassan Aden must prove that he is more likely than not going to be tortured if sent back to Somalia.[23] Torture must be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity."[24] We cannot say on the record before us that a reasonable adjudicator would be compelled to find, contrary to that of the IJ below, that Hassan Aden established these facts.[25] We thus affirm the denial of relief under the Convention Against Torture.

The petition for review is **DENIED**.

---

[23]8 C.F.R. § 1208.16(c)(2).

[24]*Id.* § 1208.18(a)(1).

[25]8 U.S.C. § 1252(b)(4)(B).