**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| MING DAI,<br>                              *Petitioner*,<br><br>                    v.<br><br>WILLIAM BARR, Attorney General,<br>                              *Respondent.* | No. 15-70776<br><br>Agency No.<br>A205-555-836<br><br>ORDER AND<br>AMENDED<br>DISSENT |

On Petition for Review of an Order of the
Board of Immigration Appeals

Submitted October 13, 2017[*]
San Francisco, California

Filed March 8, 2018
Amended February 22, 2019

Before: Sidney R. Thomas, Chief Judge, and Stephen S.
Trott and Mary H. Murguia[**], Circuit Judges.

---

[*] The panel unanimously concludes this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

[**] Prior to his death, Judge Reinhardt fully participated in this case and authored the majority opinion. Following Judge Reinhardt's death, Judge Murguia was drawn by lot to replace him. Ninth Circuit General Order 3.2h. Judge Murguia has reviewed all case materials.

Order;
Dissent to Opinion by Judge Trott

**SUMMARY**[***]

**Immigration**

The panel granted a petition for review of the Board of Immigration Appeals' denial of asylum and withholding relief.

The panel held that because neither the immigration judge nor the Board made an explicit adverse credibility determination, this court must accept Dai's testimony as true. The panel explained that the REAL ID Act added a provision creating a rebuttable presumption of credibility where the IJ fails to make an explicit adverse credibility determination, but that presumption is rebuttable only before the Board, and is not rebuttable on petition for review before this court.

The panel held that Dai's evidence was sufficiently persuasive, and compelled the conclusion that the harm he suffered from the government due to his resistance to his wife's forced abortion rose to the level of past persecution.

The panel held that because Dai and his wife were not similarly situated, the Board erred in concluding that Dai's wife's voluntary return to China undermined his own fear of future persecution. The panel further held that in the absence

_____

[***] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

of an adverse credibility determination, the Board erred in relying on Dai's untruthfulness about his wife's voluntary return to China in concluding that he failed to meet his burden of proof. The panel also noted Dai's valid asylum claim was not undermined by the fact that he may have had additional reasons (beyond escaping persecution) for coming to or remaining in the United States, including seeking economic opportunity.

The panel held that because Dai established past persecution, he was entitled to a rebuttable presumption of future persecution, which the government did not attempt to rebut with evidence of changed country conditions. The panel stated that giving the government the opportunity to present such evidence at this point would be exceptionally unfair, and thus, Dai established that he was eligible for asylum. The panel remanded for an exercise of discretion of whether to grant Dai asylum relief, and to grant Dai withholding relief.

In his amended dissent, Judge Trott wrote that the serious legal consequences of the majority opinion as a circuit precedent are that it (1) demolishes both the purpose and the substance of the REAL ID Act (2) disregards the appropriate standard of review, and (3) perpetuates this court's idiosyncratic approach to an IJ's determination that the testimony of an asylum seeker lacks sufficient credibility or persuasiveness to prove his case.

## COUNSEL

David Z. Su, Law Offices of David Z. Su, West Covina, California, for Petitioner.

Aimee J. Carmichael, Senior Litigation Counsel; Mary Jane Candaux, Assistant Director; Office of Immigration, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

## ORDER

The dissent filed March 8, 2018, is amended, with the following amended dissent to be substituted in lieu of the original. The petitions for rehearing and rehearing en banc remain pending, and no further action is required of the parties until further order of the court.

TROTT, Circuit Judge, dissenting:

The serious legal consequences of my colleagues' opinion are that it (1) disregards both the purpose and the substance of the REAL ID Act of 2005 ("Act")[1], (2) ignores the appropriate standard of review, and (3) perpetuates our idiosyncratic approach to an Immigration Judge's ("IJ") determination that the testimony of an asylum seeker lacks sufficient credibility or persuasiveness to prove his case. The majority's opinion accomplishes these results by contaminating the issue before us with irrelevancies, the most

---

[1] Pub. L. No. 109-13, 119 Stat. 231.

troublesome of which is a meritless irrebuttable presumption of credibility. The sole issue should be whether Dai's unedited presentation *compels* the conclusion that he carried his burden of proving he is a refugee and thus eligible for a discretionary grant of asylum. Only if we can conclude that no reasonable factfinder could fail to find his evidence conclusive can we grant his petition.

The IJ's decision not to make an explicit adverse credibility finding is a red herring that throws our analysis off the scent and preordains a result that is incompatible with the evidentiary record. By omitting from their opinion the IJ's fact-based explanation of his decision, the majority elides *eight* material findings of fact the IJ *did* make, each of which is entitled to substantial deference. The majority's assertion that "there is no finding to which we can defer" is false. For this reason, I quote in full the IJ's findings and conclusions about the persuasiveness of Dai's presentation in Part IV of my dissent. The eight findings are as follows.

First, the IJ specifically found that the information reported by the asylum officer about his conversation with Dai was accurate. The IJ said,

> As to the contents of [the asylum officer's notes], I give the notes full weight, insofar as the respondent has confirmed the contents of the questions and answers given during the course of that interview. Furthermore, I note that in the sections in which the respondent equivocated, stating that he was nervous and not sure that he gave those precise answers, I nevertheless give the Asylum Officer's notes some substantial weight, in that they are

consistent with the respondent's testimony in
court.

Accordingly, the IJ accepted as a fact that Dai *admitted*
that he did not disclose the consequential truth about his
wife's and daughter's travels because he was nervous about
how this would be perceived by the asylum officer in
connection with his claim.

Second, the IJ accepted Dai's admission as a fact that he
concealed the truth because he was afraid of giving straight
answers regarding his wife's and daughter's trip to the United
States.

Third, the IJ determined that Dai had deliberately omitted
highly relevant information from his Form I-589 application
for asylum, information that he also tried to conceal from the
asylum officer.

Fourth, the IJ found that Dai's omission of his
information "is consistent with his lack of forthrightness
before the asylum office[r] as to his wife and daughter's
travel with him. . . ."

Fifth, the IJ credited Dai's admission that when asked by
the asylum officer to "tell the real story" about his family's
travels, Dai said he "wanted a good environment for his child,
and his wife had a job, but he did not, and that is why he
stayed here [after his wife and daughter went back to China].

Sixth, the IJ found that Dai admitted he stayed here after
they returned "because he was in a bad mood and he wanted
to get a job and 'a friend of mine is here.'"

Seventh, the IJ said "I do *not* find that [Dai's] explanations for [his wife's] return to China while he remained here are adequate." (Emphasis added).

Finally, the IJ also credited Dai's concessions that his wife and daughter returned to China because "his daughter's education would be cheaper in China," and that "his wife wanted to go to take care of her father."

When Dai's subterfuge got to the BIA, the BIA said in its decision that "the record reflects that [Dai] failed to disclose to both the asylum officer and the IJ" the true facts about his family's travels. The BIA noted that Dai had conceded he was not forthcoming about this material information because he believed that the truth about their travels "would be perceived as inconsistent with his claims of past and feared persecution."

The IJ's specific factual findings in connection with Dai's failure to satisfy his burden of proof were not the product of inferences drawn from circumstantial evidence. These findings were directly based upon revealing answers Dai *admitted* he gave to the asylum officer during his interview. These facts are beyond debate, and they undercut Dai's case. To quote the BIA, these facts were "detrimental to his claim" and "significant to his burden of proof." Nevertheless, the majority brushes them aside, claiming that an immaterial presumption of credibility overrides all of them.

In this connection, I note a peculiarity in the majority's approach to Dai's case: Nowhere does Dai assert that he is entitled to a conclusive presumption of credibility. His brief does not contain any mention of the presumption argument the majority conjures up on his behalf. The closest Dai

comes to invoking the majority's inapt postulate is with a statement that we "should" treat as credible his testimony regarding persecution in China. He does not take issue with the IJ's foundational adverse factual findings, choosing instead to argue that they were not sufficient in the light of the record as a whole to support the IJ's ultimate determination.

For example, Dai acknowledges in his brief that the "IJ's or BIA's factual findings are reviewed for substantial evidence" and that the "REAL ID Act's new standards *governing adverse credibility determinations* applies to applications for asylum, withholding of removal, and CAT relief made on or after May 11, 2005." Blue Br. 10 (emphasis added) (quotation marks omitted). Next, he notes that "an IJ cannot selectively examine evidence in determining *credibility*, but rather must present a reasoned analysis of the *evidence as a whole* and cite specific instances in the record that *form the basis of the adverse credibility finding*." *Id.* (emphasis added) (quotation marks omitted). Moreover, Dai notes that "[t]o support *an adverse credibility determination*, inconsistencies must be considered in light of the *totality of the circumstances*, and all relevant factors" adding that "trivial inconsistencies . . . should not form the basis of *an adverse credibility determination*." *Id.* at 10–11 (emphasis added) (quotation marks omitted). He contends that he "has provided adequate explanation" for his inconsistencies, *i.e.*, the failure to disclose his family's travels. *Id.* at 14. Finally, after attempting to pick apart the IJ's adverse findings, Dai's bottom line is that "his wife's departure from the United States does not adversely affect his credibility at all," an assertion that ignores his failed coverup of it. *See id.* at 16.

In summary, the majority blue pencils a material part of the evidentiary record even though Dai implores us to "examine it as a whole," as he did in his brief to the BIA. Dai accepts that the viability of his *entire* presentation is on the line, but the majority ignores his concession. In this connection, the Attorney General has responded only to the claims and arguments Dai included in his brief. The Attorney General has not been given an opportunity to respond to the majority's inventive analysis, nor to the theory concocted by the majority on Dai's behalf. Both sides will be surprised by my colleagues' artful opinion—Dai pleasantly, the Attorney General not so much.

I will have more to say in Part V about our Circuit's treatment of the role, responsibility, and product of an asylum officer.

For these reasons, I respectfully dissent.

# I

## Backdrop

Over the years, our Circuit has manufactured misguided rules regarding the credibility of political asylum seekers. I begin with this issue because the majority's mishandling of it infects the remainder of their opinion with error. These result-oriented ad hoc hurdles for the government stem from humanitarian intentions, but our court has pursued these intentions with methods that violate the institutional differences between a reviewing appellate court, on one hand, and a trial court on the other, usurping the role of the Department of Homeland Security ("DHS") and the BIA in the process. Referring to our approach to witness credibility

as an "idiosyncratic analytical framework," a previous panel
of our court described this inappropriate situation as follows:

> The Supreme Court has repeatedly instructed
> us on the proper standard to apply when
> reviewing an immigration judge's adverse
> credibility determination. Time and again,
> however, we have promulgated rules that tend
> to obscure that clear standard and to flummox
> immigration judges, who must contort what
> should be a simple factual finding to satisfy
> our often irreconcilable precedents. The
> result of this sly insubordination is that a
> panel that takes Congress at its word and
> accepts that findings of fact are "conclusive
> unless any reasonable adjudicator would be
> compelled to conclude the contrary," . . . or
> follows the Supreme Court's admonition that
> "[t]o reverse the BIA finding we must find
> that the evidence not only *supports* that
> conclusion, but *compels* it," . . . runs a serious
> risk of flouting one of our eclectic, and
> sometimes contradictory, opinions.

*Jibril v. Gonzales*, 423 F.3d 1129, 1138 (9th Cir. 2005)
(alteration in original) (citations omitted).

Many of our Circuit's rules on this subject and my
colleagues' decision are irreconcilable with the structural
principle set forth in Federal Rule of Civil Procedure 52(a)(6)
that "[f]indings of fact, whether based on oral or other
evidence, must not be set aside unless clearly erroneous, and
the reviewing court must give due regard to the trial court's
opportunity to judge the witnesses' credibility." Accordingly,

we are expected to apply a highly deferential standard to a trial court's determination regarding the credibility of a witness. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–76 (1985). In discussing this rule, the Supreme Court said that "[w]hen findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Id.* at 575. The Court added that the applicable "clearly erroneous" standard of review "plainly does not entitle a *reviewing* court to reverse the finding of a trier of fact simply because it is convinced that it would have decided the case differently. The *reviewing* court oversteps the bounds of its duty under Rule 52(a) if it undertakes to duplicate the role of the lower court." *Id.* at 573 (emphasis added).

The Supreme Court sharpened this point about our limited role in *Gonzales v. Thomas*, 547 U.S. 183 (2006) (per curiam), *vacating* 409 F.3d 1177 (9th Cir. 2005) (en banc). In summarily vacating our en banc opinion, the Court held that we had exceeded our authority and made a determination that belonged to the BIA. 547 U.S. at 185–86. The Court agreed with the Solicitor General that "a court's role in an immigration case is typically *one of review, not of first view*." *Id.* at 185 (emphasis added) (quotation marks omitted). To support its conclusion, the Court cited *INS v. Orlando Ventura*, 537 U.S. 12 (2002): a "'judicial judgment cannot be made to do service for an administrative judgment.'" 547 U.S. at 186 (quoting *Ventura*, 537 U.S. at 16). More about *Ventura* later.

The majority's opinion's use of an incongruous irrebuttable presumption of credibility to erase the IJ's findings of fact and the BIA's decision and thus to make us a court of "first view" is another example of our intransigence. If, as they say, we are bound by precedent to do it their way, then its time to change our precedent.

## II

### A False Premise

The majority opinion's assertion that "we must treat [Dai's] testimony as credible" rests on a fallacious premise. Judge Reinhardt writes, "Properly understood, the rebuttable presumption provision of the REAL ID Act applies only to appeals to the BIA, not to petitions for review in our court." From this inapt premise, he concludes that we *must* ignore the IJ's detailed analysis and findings of fact about Dai's presentation. When it comes to our task of reviewing the credibility of witnesses in a trial court or whether a witness' testimony suffices to carry his burden of proof, however, there is no material difference between an appeal and a petition for review, none. Federal Rule of Civil Procedure 52(a) makes no such distinction. As *Anderson* said, Rule 52(a) applies to a "*reviewing* court," which is what we are in this capacity. 470 U.S. at 573–74 (emphasis added); *see Thomas*, 547 U.S. at 185. Neither the Court nor Rule 52(a) differentiate between appeals and petitions for review. Nor would such a distinction make any sense. As *Anderson* and *Thomas* illustrate, the issue is one of *function*, not of form or labels. The Act's use of the word "appeal" does not dictate how we must go about our process of review. Using the standards provided by Congress, we are not in a position to weigh a witness's credibility or persuasiveness.

Federal Rule of Appellate Procedure 20, "Applicability of Rules to the Review or Enforcement of an Agency Order," illustrates the soundness of treating appeals and petitions for review with a uniform approach. Rule 20 reads, "All provisions of these rules . . . apply to the review or enforcement of an agency order. In these rules, 'appellant' includes a petitioner or applicant, and 'appellee' includes a respondent."

Moreover, and directly to the point, the Act itself does *not* require an IJ to make a specific credibility finding in those precise terms. As the BIA correctly said with respect to the Act, "[c]ontrary to the respondent's argument on appeal, the Immigration Judge need not have made an explicit adverse credibility finding to nevertheless determine that the respondent did not meet his burden of proving his asylum claim." *See* discussion *infra* Section VI. If the IJ does not make such an explicit finding, all the respondent is entitled to is a "*rebuttable* presumption of credibility on appeal." 8 U.S.C. § 1158(b)(1)(B)(iii) (emphasis added). By attempting to restrict this language to an appeal *to the BIA*, the majority opinion frees itself to apply derelict Ninth Circuit precedent to Dai's testimony and automatically to deem it credible.[2]

My colleagues claim that in the absence of a formal adverse credibility finding, "we are required to treat the petitioner's testimony as credible." The practical effect of the majority's rule is breathtaking: The *lack* of a formal adverse

---

[2] The majority cites *She v. Holder*, 629 F.3d 958, 964 & n.5 (9th Cir. 2010) in support of this ipse dixit claim. However, *She*'s footnote 5 says that because the "rebuttable presumption" provision does not apply retroactively, it had no applicability in *She*'s case.

credibility finding becomes a selective positive credibility finding and dooms a fact-based determination by an IJ and the BIA that an applicant's case is not sufficiently persuasive to carry his burden of proof.   The majority's approach violates all the rules that control our review of a witness's testimony before a factfinder.

A conclusive presumption of credibility has no valid place in our task of reviewing the persuasiveness of a witness's testimony.    Such an artifice eliminates relevant factual evidence from consideration and violates Rule 52(a)(6).  The deployment of a conclusive presumption becomes a misguided way not only of putting a heavy thumb on one tray of the traditional scales of justice, but also of removing relevant evidence from the other.  This approach allows us to evade our responsibilities to examine and to evaluate the *entire* record before an IJ, permitting us instead to disregard facts that would otherwise discredit our final determination. The evidentiary record in this case devours any such presumption. Judge Reinhardt's opinion writes the REAL ID Act and its reference to a *rebuttable* presumption of credibility out of existence, even though Congress specifically intended the Act to govern *us*, the Ninth Circuit Court of *Appeals*.

Although the case focuses on corroboration of an applicant's testimony, our opinion in *Aden v. Holder*, 589 F.3d 1040 (9th Cir. 2009) correctly explained the effect of the REAL ID Act on our pre-Act jurisprudence.

> We have a line of circuit authority for the proposition that corroboration cannot be required from an applicant who testifies credibly.  In *Ladha v. INS*, [215 F.3d 889, 901

(9th Cir. 2000)] we 'reaffirmed that an alien's testimony, if unrefuted and credible, direct and specific, is sufficient to establish the facts testified without the need for any corroboration.' *Kataria v. INS* [232 F.3d 1107, 1113 (9th Cir. 2000)] relied on *Ladha* in stating that 'the BIA may not require independent corroborative evidence from an asylum applicant who testifies credibly in support of his application.' *Kataria* stated that 'we must accept an applicant's testimony as true in the absence of an explicit adverse credibility finding.'. . .

Congress abrogated these holdings in the REAL ID Act of 2005. . . .

The statute additionally restricts the effect of apparently credible testimony by specifying that the IJ need not accept such testimony as true. . . .

Congress has thus swept away our doctrine that 'when an alien credibly testifies to certain facts, those facts are deemed true.'

*Aden*, 589 F.3d at 1044-45. More on the Act in the next section.

## III

## The REAL ID Act

Congress enacted the REAL ID Act of 2005 because of our Circuit's outlier precedents on this issue and our refusal to follow the rules. The House Conference Committee Report ("House Report")[3] explained that "the creation of a uniform standard for credibility is needed to address a conflict . . . between the Ninth Circuit on one hand and other circuits and the BIA." H.R. Rep. No. 109-72 at 167. The House Report also said that the Act "resolves conflicts between administrative and judicial tribunals with respect to standards to be followed in assessing asylum claims." *Id.* at 162. Nevertheless, my colleagues hold that a key part of the Act does not apply to us, only to the BIA.

As the Act pertains to this case, it established a number of key principles, all of which the majority fails to follow, perpetuating the conflicts Congress attempted to resolve.

First, "[t]he burden of proof is on the applicant to establish that the applicant is a refugee . . . ."[4]

Second, "[t]he testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration, but only if the applicant *satisfies the trier of fact* that the applicant's testimony is credible, is *persuasive*,

---

[3] H.R. Rep. No. 109-72 (2005) (Conf. Rep.), *reprinted in* 2005 U.S.C.C.A.N. 240.

[4] 8 U.S.C. § 1158(b)(1)(B)(i).

and refers to specific facts sufficient to demonstrate that the applicant is a refugee."[5]

Third,

>Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor. There is no presumption of credibility, however, if no adverse credibility determination is explicitly made, the applicant or witness shall have a rebuttable presumption of credibility on appeal.[6]

---

[5] 8 U.S.C. § 1158(b)(1)(B)(ii) (emphasis added).

[6] 8 U.S.C. § 1158(b)(1)(B)(iii).

We have attempted in a number of panel opinions after the Act to adjust our approach to applicant credibility and persuasiveness issues, but as the majority opinion illustrates, "old ways die hard." *Huang v. Holder*, 744 F.3d 1149 (9th Cir. 2014) captures where we should be on this issue:

> [W]e have concluded that "the REAL ID Act requires a healthy measure of deference to agency credibility determinations." This deference "makes sense because IJs are in the best position to assess demeanor and other credibility cues that we cannot readily access on review." "[A]n immigration judge alone is in a position to observe an alien's tone and demeanor, to explore inconsistencies in testimony, and to apply workable and consistent standards in the evaluation of testimonial evidence." By virtue of their expertise, IJs are "uniquely qualified to decide whether an alien's testimony has about it the ring of truth."
>
> The need for deference is particularly strong in the context of demeanor assessments. Such determinations will often be based on non-verbal cues, and "[f]ew, if any, of these ephemeral indicia of credibility can be conveyed by a paper record of the proceedings and it would be extraordinary for a reviewing court to substitute its second-hand impression of the petitioner's demeanor, candor, or responsiveness for that of the IJ." Indeed, even before the enactment of the REAL ID Act, we recognized the need to give

> "special deference to a credibility determination that is based on demeanor," because the important elements of a witness's demeanor that "may convince the observing trial judge that the witness is testifying truthfully or falsely" are "entirely unavailable to a reader of the transcript, such as the Board or the Court of Appeals." The same principles underlie the deference we accord to the credibility determinations of juries and trial judges.

*Id.* at 1153–54 (alterations in original) (citations omitted). This "healthy measure of deference" should also apply to the agency's determination with respect to whether an applicant has satisfied the agency's "*trier of fact*"—*not us*—that his evidence is persuasive, an issue that is in the wheelhouse of a jury or a judge or an IJ hearing a case as a factfinder.

In *Kho v. Keisler*, 505 F.3d 50 (1st Cir. 2007), the First Circuit understood the Act's effect on the issue of an applicant's credibility. Not only did our sister circuit correctly comprehend the Act's impact, but it considered and rejected our approach to this important subject.

> Kho supplements his 'disfavored group' approach with an argument that because the IJ did not make an explicit finding concerning Kho's credibility, his testimony 'must be accepted as true' by this court. Kho bases this proposed rule as well on a series of Ninth Circuit cases. . . .

> We have already rejected the proposition that aliens are entitled to a presumption of credibility on review in this court if there is no express credibility determination made by an IJ. . . .
>
> The REAL ID Act also provides no support for Kho's argument. . . .

*Kho*, 505 F.3d at 56-57.

The court further explained that the Act's reference to a "rebuttable presumption" applies only to an applicant's appeal to the BIA, not to "reviewing courts of appeal." *Id.* at 56.

Thus, not only does my colleagues' opinion violate the directions of the Act, but it creates an intercircuit conflict with *Kho*, and an intra-circuit conflict with *Aden*.

## IV

### The IJ's Decision

The IJ in this case concluded that Ming Dai had not satisfied his statutory burden of establishing that he is a refugee pursuant to § 1158(b)(1)(B)(i). The IJ gave as his "principle area of concern" Dai's implausible unpersuasive testimony, another way of saying it wasn't credible. As Dai's brief correctly demonstrates, there is barely a dime's worth of substantive difference between "credible" and "persuasive." Here is how the IJ explained his decision in terms of § 1158(b)(1)(B)(i) and (ii):

I have carefully considered the respondent's testimony and evidence and for the following reasons, I find that the respondent has failed to meet his burden of proving eligibility for asylum.

The principal area of *concern with regard to the respondent's testimony* arose during the course of his cross-examination. On cross-examination, the respondent was asked about various aspects of his interview with an Asylum Officer. The Department of Homeland Security also submitted the notes of that interview as Exhibit 5. The respondent was asked specific questions regarding several aspects of his testimony before the Asylum Officer. In the course of cross-examination, the respondent was asked regarding his questions and answers as to whether his wife and daughter travelled with him to the United States. The respondent's responses included the question of whether the asylum officer had asked him if his wife and daughter travelled anywhere other than to Taiwan and Hong Kong. The respondent conceded that he was asked this question and that he replied yes, they had travelled to Taiwan and Hong Kong. The respondent was asked whether the Asylum Officer inquired whether his wife and daughter had travelled elsewhere. The respondent then testified before the Court that he was asked this question, "but I was nervous." In this regard, I note that the respondent did not directly answer the

question; instead leapt directly to an
explanation for what his answer may have
been, namely that he was nervous. The
respondent was then asked specifically
whether the Asylum Officer asked him if his
wife had travelled to Australia in 2007. The
respondent confirmed that he had been asked
this question, and he confirmed that the
answer was in the affirmative. The
respondent also confirmed that the Asylum
Officer had asked him whether she had
travelled anywhere else. He confirmed that he
had been so asked. The respondent was then
asked whether he answered "no," that she had
not travelled anywhere else. The respondent
answered that he believed so, that he had so
answered. The respondent was then asked,
during the course of cross-examination, why
he had not said to the Asylum Officer that yes,
she had travelled to the United States. The
respondent replied that he had not thought of
it. He stated that they did come with him
(meaning his wife and daughter) and that he
thought the Asylum Officer was asking him if
they had travelled  anywhere other than the
United States. He explained that he did so
because he assumed the U.S. Government had
the records of their travel to the United States.
On further questioning, the respondent
eventually hesitated at some length when
asked to further explain why he did not
disclose spontaneously to the Asylum Officer
that his wife and daughter had come with him.
The respondent paused at some length and I

observed that the respondent appeared nervous and at a loss for words. However, after a fairly lengthy pause, the respondent testified that he is afraid to say that his wife and daughter came here and why they went back. The respondent was asked whether he told the Asylum Officer that he was afraid to answer directly. The respondent initially testified that he forgot and did not remember whether he said that. He again reiterated that he was very nervous. He was then asked the question again as to whether he told the Asylum Officer that he was afraid to answer why his wife and daughter had gone back. He then conceded that maybe, yes, he had answered in that fashion. The respondent was asked whether the Asylum Officer inquired why his wife and daughter went back, and the respondent conceded that he had been so asked, and he further conceded that he replied because school in the United States cost a lot of money (referring to the schooling for his daughter). The respondent was then asked to confirm that the Asylum Officer eventually asked him to tell him the real story as to why his family travelled to the United States and returned to China. The respondent confirmed that he was asked this question and when asked, whether he replied that it was because he wanted a good environment for his child and because his wife had a job and he did not and that that is why he stayed here. He confirmed that he did, in fact, say that. The respondent was further asked, during the

course of testimony in court, why his wife and daughter returned to China. In this regard, the respondent testified that they came with him, but returned to China several weeks after arrival. He testified that they did so because his father-in-law was elderly and needed attention, and because his daughter needed to graduate school in China.

The respondent further claimed that his wife had, in fact, suffered past persecution in the form of a forced abortion and the respondent confirmed that he feared his wife and daughter would suffer future persecution. In this regard, the respondent qualified his answer by saying that his wife was now on an IUD, apparently thereby suggesting that the risk of persecution is reduced. However, the respondent did concede that the risk of future persecution also pertains to his daughter. Indeed, in this regard, the respondent testified that this is, at least in part, why he applied for asylum.

*As to the contents of Exhibit 5, I give the notes full weight, insofar as the respondent has confirmed the contents of the questions and answers given during the course of that interview. Furthermore, I note that in the sections in which the respondent equivocated, stating that he was nervous and not sure that he gave those precise answers, I nevertheless give the Asylum Officer's notes some substantial weight, in that they are consistent*

*with the respondent's testimony in court.* Specifically, I note that the Asylum Officer's notes state that the respondent ultimately indicated that he was afraid of giving straight answers regarding his daughter and wife's trip to the United States and return to China. And while the respondent did not confirm this in court, he did give a similar answer as to why he was testifying in this regard. In other words, the respondent appears to have stated, both before the Asylum Officer and in court that he did not spontaneously disclose the travel of his wife and daughter with him to the United States and their return because *he was nervous about how this would be perceived by the Asylum Officer in connection with his claim*. I further note that the Asylum Officer's notes are internally consistent with regard to references to earlier questions, such as whether the respondent had stated that he applied for a visa with anyone else. *At page 2 of the notes contained in Exhibit 5, the respondent was asked whether he applied for his visa with anyone else and the notes indicated that he stated that, "no, I applied by myself." Similarly, I note that the testimony before the Asylum Officer and the Court is consistent with the omission in the respondent's Form I-589 application for asylum, of an answer to the question of the date of the previous arrival of his wife, if she had previously been in the United States. See* Exhibit 2, page 2, part A.II, question 23. When asked about this omission, the

respondent expressed surprise, stating that he told the preparer about their trip and indicated that he thought it had been filled out. Notwithstanding the respondent's statement in this regard, *I do observe that the omission is consistent with his lack of forthrightness before the asylum office as to his wife and daughter's travel with him to the United States and their subsequent return to China shortly thereafter*.

In sum, the respondent's testimony before the Court and his testimony regarding the Asylum Officer notes, as well as the notes themselves, clearly indicate that the respondent failed to spontaneously disclose that his wife and daughter came with him and then returned to China. His testimony and the notes also consistently demonstrate that the respondent paused at length, both before the Court and before the Asylum Officer, when asked about this topic. His testimony and the Asylum Officer notes are also consistent in indicating that he ultimately testified that he was afraid to say that his wife came here and was afraid of being asked about why she went back. *Furthermore, the respondent has conceded that he was asked to "tell the real story" about his family's travel to the United States by the Asylum Officer, and that he replied that he wanted a good environment for his child and his wife had a job, but he did not, and that is why he stayed here.*

In *Loho v. Mukasey*, 531 F.3d 1016, 1018–19 (9th Cir. 2008), the Ninth Circuit addressed the situation in which an asylum applicant has found safety in the United States and then returns to the country claimed of persecution before eventually finding asylum in the United States. The Ninth Circuit held that the applicant's voluntary return to the country of claimed persecution may be considered in assessing both credibility and whether the respondent has a well-founded fear of persecution in that country. Here, while the respondent himself has not returned to China, his wife and daughter did. Indeed they did so shortly after arriving in the United States, and the respondent confirmed that they did so because the schooling is cheaper for his daughter in China, as well as because his father-in-law is elderly and needed to be cared for. The respondent also told the Asylum Officer that the "real story" about whey [sic] his family returned was that his wife had a job and he did not, and that is why he stayed here. This is consistent with respondent's testimony before the Court that he did not have a job at the time he came to the United States. Furthermore, I note that the respondent's claim of persecution is founded on the alleged forced abortion inflicted upon his wife. That is the central element of his claim. The respondent claims that he himself was persecuted through his resistance to that abortion. Nevertheless, the fact remains that the fundamental thrust of the respondent's

claim is that his wife was forced to have an abortion. In this regard, the respondent's wife therefore clearly has an equal, or stronger, claim to asylum than the respondent himself, assuming the facts which he claims are true. The respondent was asked why his wife did not stay and apply for asylum and he replied that he did not know they could apply for asylum at the time they departed. *The respondent was then asked why he stayed here after they returned; he said because he was in a bad mood and he wanted to get a job and a friend of mine is here.*

While *Loho v. Mukasey* applies to the applicant himself returning to China, I find that the reasoning of the Ninth Circuit in that case is fully applicable to the respondent's situation in that his wife, who is the primary object of the persecution in China, freely chose to return to China. *I do not find that the respondent's explanations for her return to China while he remained here are adequate.* The respondent has stated that he was in a bad mood and that he had found a job and had a friend here. The respondent has also indicated that his daughter's education would be cheaper in China than here, and he has also indicated that his wife wanted to go to take care of her father. I do not find that these reasons are sufficiently substantial so as to outweigh the concerns raised by his wife and daughter's free choice to return to China after

having allegedly fled that country following his wife's and his own persecution.

In view of the for[e]going, I find that the respondent has failed to meet his burden of proving eligibility for asylum under Section 208(a) of the Act.

(Emphasis added).

To erase any doubts about Dai's problematic testimony, the following is an excerpt from it.

MS. HANNETT TO MR. DAI

> Q. And isn't it also true that the [asylum] officer asked why did they go back and you replied, so that my daughter can go to school and in the U.S., you have to pay a lot of money?

> A. Yes, that's what I said.

> Q. Okay. And isn't it also true that the officer asked you, can you tell me the real story about you and your family's travel to the U.S., and you replied I wanted a good environment for my child. My wife had a job and I didn't, and that is why I stayed here. My wife and child go home first.

A.  I believe I said that.

* * *

Q.  So, once you got to the United
    States, why didn't your wife apply
    for asylum?

A.  My wife just returned to China.

Q.  Right, and my question is why
    didn't she stay here and apply for
    asylum?

A.  At that time, we didn't know the
    apply, we didn't know that we can
    apply for asylum.

Q.  Well, if you didn't know that you
    could apply for asylum, why did
    you stay here after they returned?

A.  Because at that time, I was in a
    bad mood and I couldn't get a job,
    so I want to stay here for a bit
    longer and another friend of mine
    is also here.

The asylum officer's interview notes discussed by the IJ
(and found to be consistent with Dai's testimony before the
IJ) read as follows:

> Earlier you said your wife has only traveled to
> Australia, Taiwan and HK.  You also said that

you traveled to the US alone.  Government records indicate that your wife traveled with you to the United States.  Can you explain?

> [long pause] the reason is I'm afraid to say that my wife came here, then why did she go back.

Your wife went back?      Yes

When did she go back to China?  February

Why did she go back?      Because my child go to school

Earlier you said you applied for your visa alone.  Our records indicate that your child also obtained a visa to the US with you.  Can you explain?

> [long pause]

Daughter came with wife and you in January? Yes

Can you explain?  I'm afraid

Please tell me what you are afraid of.  That is what your interview today is for.  To understand your fears?

> I'm afraid you ask why my wife and daughter go back

Why did they go back?

> So that my daughter can go to school
> and in the US you have to pay a lot of
> money.

Can you tell me the real story about you and
your family's travel to the US?

> I wanted a good environment for my
> child.  My wife had a job and I didn't
> and that is why I stayed here.  My
> wife and child go home first.

(bracketed notations in original).

## V

## The Role of an Asylum Officer

The majority's opinion perpetuates another acute error our Circuit has made in its effort to control the DHS's administrative process.  In footnote 2, the majority say that if Dai concealed relevant information "it was only from the asylum officer."  *Only* from the asylum officer?  So Dai's admitted concealment *under oath* of germane information during a critical part of the evaluation process is of no moment?

The majority's misunderstanding of the role of an asylum officer represents a sub silentio application of another faulty proposition on the books in our circuit: *Singh v. Gonzales*, 403 F.3d 1081 (9th Cir. 2005).

> Certain features of an asylum interview make it *a potentially unreliable point of comparison* to a petitioner's testimony for purposes of a credibility determination. *Barahona-Gomez v. Reno*, 236 F.3d 1115 (9th Cir. 2001), explained the significant procedural distinctions between the initial *quasi-prosecutorial* "informal conferences conducted by asylum officers" after the filing of an asylum application, and the "quasi-judicial functions" exercised by IJs . . . .

*Id.* at 1087 (emphasis added).

First of all, we may not have in this case a verbatim transcript of Dai's testimony, but we have the asylum officer's notes, which the IJ explicitly found to be accurate. Moreover, when appropriately confronted under oath with the notes, Dai admitted they correctly captured what he said. Under these circumstances, any concern that the asylum interview might be a "potentially unreliable point of comparison" to Dai's testimony is irrelevant. The record (thanks to Dai himself) eliminates any potential for unreliability.

Second, the pronouncement in *Singh v. Gonzales* that an asylum officer's interview in an *affirmative* asylum case is "quasi-prosecutorial" in nature is flat wrong and reveals our fundamental misunderstanding of the process.[7] An asylum

---

[7] An affirmative asylum case differs from a defensive asylum case involving someone already in removal proceedings. *See Obtaining Asylum in the United States*, DEP'T OF HOMELAND SEC.,

officer in an affirmative asylum case does not "prosecute" anyone during the exercise of his responsibilities, and the process is not "quasi-prosecutorial" in nature. In fact, unlike a prosecutor, an asylum officer has the primary authority and discretion to grant asylum to an applicant should the applicant present a convincing case. The asylum officer's role is essentially judicial, not prosecutorial. We miss the mark here because we see only those cases where an affirmative asylum applicant did not present a sufficiently credible persuasive case to an asylum officer to prevail, and we mistakenly conclude from that unrepresentative sample that asylum officers tend to decide against such applicants.

The true facts emerge from DHS's June 20, 2016 report to Congress, *Affirmative Asylum Application Statistics and Decisions Annual Report*, covering "FY 2015 adjudications of affirmative asylum applications by USCIS [U.S. Citizenship & Immigration Services] asylum officers for the stated period."[8] By way of background, the Report points out that asylum officers have a central determinative role in the process. Asylum determinations "are made by an asylum officer after an applicant files an affirmative asylum application, is interviewed, and clears required security and background checks." *Id.* at 2.

---

https://www.uscis.gov/humanitarian/refugees-asylum/asylum/obtaining-asylum-united-states (last updated Oct. 19, 2015).

[8] *2016 DHS Congressional Appropriations Reports*, DEP'T OF HOMELAND SEC., https://www.dhs.gov/publication/2016-dhs-congressional-appropriations-reports (last published Feb. 12, 2018) (follow "United States Citizenship and Immigration Services (USCIS) - Affirmative Asylum Application Statistics & Decisions FY16 Report" hyperlink).

The Report contains statistics about the activity of asylum officers. According to the FY2015 statistics, asylum officers completed 40,062 affirmative asylum cases. They approved 15,999 applications for an approval rate of 47% for interviewed cases. *Id.* at 3.

USCIS has a Policy Manual. Chapter 1 of Volume 1 establishes its "Guiding Principles."[9] A "Core Principal" reads as follows:

> The performance of agency duties inevitably means that some customers will be disappointed if their cases are denied. Good customer service means that everyone USCIS affects will be treated with dignity and courtesy regardless of the outcome of the decision.
>
> *     *     *
>
> USCIS will approach each case objectively and adjudicate each case in a thorough and fair manner. USCIS will carefully administer every aspect of its immigration mission so that its customers can hold in high regard the privileges and advantages of U.S. immigration.

*Id.*

---

[9] *Policy Manual*, U.S. CITIZENSHIP & IMMIGRATION SERVS., https://www.uscis.gov/policymanual/HTML/PolicyManual-Volume1-PartA-Chapter1.html (Aug. 23, 2017).

Finally, we look at the training given to asylum officers in connection with their interviews of affirmative asylum applicants. In USCIS's Adjudicator's Field Manual, we find in Appendix 15-2, "Non-Adversarial Interview Techniques," the following guidance.[10]

### I. OVERVIEW

An immigration officer will conduct an interview for each applicant, petitioner or beneficiary where required by law or regulation, or if it is determined that such interviewed [sic] is appropriate. *The interview will be conducted in a non-adversarial manner*, separate and apart from the general public. The officer must always keep in mind his or her responsibility to uphold the integrity of the adjudication process. As representatives of the United States Government, officers must conduct the interview in a professional manner.

\* \* \*

Due to the potential consequences of incorrect determinations, it is incumbent upon officers

---

[10] *Adjudicator's Field Manual - Redacted Public Version*, U.S. CITIZENSHIP & IMMIGRATION SERVS., https://www.uscis.gov/ilink/docView/AFM/HTML/AFM/0-0-0-1.html (follow "Appendices" hyperlink; then follow "15-2 Non-Adversarial Interview Techniques" hyperlink) (last visited Feb. 15, 2018) (emphasis added).

to conduct organized, focused, and well-planned, *non-adversarial interviews . . . .*

\*   \*   \*

## III. NON-ADVERSARIAL NATURE OF THE INTERVIEW

### A. Concept of the Non-adversarial Interview

A non-adversarial proceeding is one in which the parties are not in opposition to each other. This is in contrast to adversarial proceedings, such as civil and criminal court proceedings, where two sides oppose each other by advocating their mutually exclusive positions before a neutral arbiter until one side prevails and the other side loses. *A removal proceeding before an immigration judge is an example of an adversarial proceeding*, where the Service trial attorney is seeking to remove a person from the United States, while the alien is seeking to remain.

The interview is part of a non-adversarial proceeding. The principal intent of the Service is not to oppose the interviewee's goal of obtaining a benefit, but to determine whether he or she qualifies for such benefit. If the interviewee qualifies for the benefit, it is in the Service's interest to accommodate that goal.

\*    \*    \*

**B. Points to Keep in Mind When Conducting a Non-adversarial Interview**

The officer's role in the non-adversarial interview is to ask questions formulated to elicit and clarify the information needed to make a determination on the petitioner or applicant's request. This questioning must be done in a professional manner that is non-threatening and non-accusatory.

1. The officer must:

a. Treat the interviewee with respect. Even if someone is not eligible for the benefit sought based on the facts of the claim, the officer must treat him or her with respect. The officer may hear similar claims from many interviewees, but must not show impatience towards any individual. Even the most non-confrontational officer may begin to feel annoyance or frustration if he or she believes that the interviewee is lying; however, it is important that the officer keep these emotions from being expressed during the interview.

b. Be non-judgmental and non-moralistic. Interviewees may have reacted to situations differently than the officer might have reacted. The interviewee may have left family members behind to fend for themselves, or may be a member of a group or organization

for which the officer has little respect. Although officers may feel personally offended by some interviewee's actions or beliefs, officers must set their personal feelings aside in their work, and avoid passing moral judgments in order to make neutral determinations.

c. Create an atmosphere in which the interviewee can freely express his or her claim. The officer must make an attempt to put the interviewee at ease at the beginning of the interview and continue to do so throughout the interview. If the interviewee is a survivor of severe trauma (such as a battered spouse), he or she may feel especially threatened during the interview. As it is not always easy to determine who is a survivor, officers should be sensitive to the fact that every interviewee is potentially a survivor of trauma.

Treating the interviewee with respect and being non-judgmental and non-moralistic can help put him or her at ease. There are a number of other ways an officer can help put an interviewee at ease, such as:

• Greet him or her (and others) pleasantly;

• Introduce himself or herself by name and explain the officer's role;

• Explain the process of the interview to the interviewee so he or she will know what to expect during the interview;

• Avoid speech that appears to be evaluative or that indicates that the officer thinks he or she knows the answer to the question;

• Be patient with the interviewee; and

• Keep language as simple as possible.

d. Treat each interviewee as an individual. Although many claims may be similar, each claim must be treated on a case-by-case basis and each interviewee must be treated as an individual. Officers must be open to each interviewee as a potential approval.

e. Set aside personal biases. Everyone has individual preferences, biases, and prejudices formed during life experiences that may cause them to view others either positively or negatively. Officers should be aware of their personal biases and recognize that they can potentially interfere with the interview process. Officers must strive to prevent such biases from interfering with their ability to conduct interviews in a non-adversarial and neutral manner.

f. Probe into all material elements of the interviewee's claim. The officer must elicit all relevant and useful information bearing on the applicant or beneficiary's eligibility. The officer must ask questions to expand upon and clarify the interviewee's statements and information contained on the form. The response to one question may lead to additional questions about a particular topic or event that is material to the claim.

g. Provide the interviewee an opportunity to clarify inconsistencies. The officer must provide the interviewee with an opportunity during the interview to explain any discrepancy or inconsistency that is material to the determination of eligibility. He or she may have a legitimate reason for having related testimony that outwardly appears to contain an inconsistency, or there may have been a misunderstanding between the officer and the interviewee. Similarly, there may be a legitimate explanation for a discrepancy or inconsistency between information on the form and the interviewee's testimony.

On the other hand, the interviewee may be fabricating a claim. If the officer believes that an interviewee is fabricating a claim, he or she must be able to clearly articulate why he or she believes that the interviewee is not credible.

h. Maintain a neutral tone throughout the interview. Interviews can be frustrating at times for the officer. The interviewee may be long-winded, may discuss issues that are not relevant to the claim, may be confused by the questioning, may appear to be or may be fabricating a claim, etc. It is important that the officer maintain a neutral tone even when frustrated.

2. The officer must not:

•   Argue in opposition to the applicant or petitioner's claim (if the officer engages in argument, he or she has lost control of the interview);

•   Question the applicant in a hostile or abusive manner;

•   Take sides in the applicant or petitioner's claim;

•   Attempt to be overly friendly with the interviewee; or

•   Allow personal biases to influence him or her during the interview, either in favor of or against the interviewee.

I hope that by exposing the particulars of the affirmative application process we will correct our understanding of the applicant interview process, and that we will drop our uninformed characterization of it as "quasi-prosecutorial."

While under oath, Dai intentionally concealed material information from the asylum officer during a critical aspect of the process.  To diminish the import of this potential crime[11] because the government official was "only" an asylum officer is a serious mistake.

## VI

## The BIA's Decision

Dai unsuccessfully appealed the IJ's decision denying his application for asylum, withholding of removal, and protection under the Convention Against Torture.  The BIA's decision follows.

> We review for clear error the findings of fact, including determinations of credibility, made by the Immigration Judge.  We review de novo all other issues, including whether the parties have met the relevant burden of proof, and issues of discretion.  The respondent filed his application for asylum after May 11, 2005, and thus review is governed by the REAL ID Act of 2005.
>
> *We adopt and affirm the Immigration Judge's decision in this case.  The Immigration Judge correctly denied the respondent's applications for failure to meet his burden of proof.*  The record reflects that the respondent failed to

---

[11] 18 U.S.C. § 1001 makes it a crime knowingly and willfully to make a material false statement in any matter within the jurisdiction of the executive branch of Government.

disclose to both the [DHS] asylum officer and the Immigration Judge that his wife and daughter had traveled with him to the United States and voluntarily returned to China shortly after. *The respondent further conceded that he was not forthcoming about this information because he believed that the true reasons for their return—that his wife had a job in China and needed to care for her elderly father, and that their daughter could attend school in China for less money than in the United States—would be perceived as inconsistent with his claims of past and feared future persecution.*

The Immigration Judge correctly decided that the voluntary return of the respondent's wife and daughter to China, after allegedly fleeing following the persecution of the respondent and his wife, prevents the respondent from meeting his burden of proving his asylum claim. *Contrary to the respondent's argument on appeal, the Immigration Judge need not have made an explicit adverse credibility finding to nevertheless determine that the respondent did not meet his burden of proving his asylum claim.* The respondent's family voluntarily returning *and his not being truthful about it is detrimental to his claim and is significant to his burden of proof.*

(Emphasis added) (footnote and citations omitted).

# VII

## The IJ Becomes a Potted Plant

My colleagues' opinion boils down to this faulty proposition: Simply because the IJ did not say "I find Dai not credible" but opted instead to expose the glaring factual deficiencies in Dai's presentation and to explain in specific detail and at length why Dai had not persuasively carried his burden of proving his case, we must selectively embrace as persuasive Dai's problematic presentation regarding the core of his claim.[12]  I invite the reader to review once again the IJ's decision and to decide on the merits whether Dai's case is persuasive.  It is anything but.

My colleagues expunge from the record the blatant flaws in Dai's performance involving demeanor, candor, and responsiveness, claiming that "taking into account the record as a whole, nothing undermines the persuasiveness of Dai's credible testimony. . . ."  Nothing?  They disregard inaccuracies, inconsistencies, and implausibilies in his story, and his barefaced attempt to cover up the truth about his wife's and daughter's travels and situation.  They even sweep aside Dai's admission to the asylum officer that the "real story" is that (1) he wanted a good environment for his child, (2) his wife left him behind because she had a job in China and he did not, and (3) he was in a "bad mood," couldn't get a job, and wanted to stay here "for a bit longer."  In their opinion, there is not a single word regarding the factors cited by the IJ to explain his observations, findings, and decision, including the fact that Dai's wife, allegedly the initial subject

---

[12] And if an IJ does make an adverse credibility finding, we have manufactured a multitude of ways to disregard it.

of persecution in China, made a free choice to return. The effect of the presumption is to wipe the record clean of everything identified by the IJ and the BIA as problematic.

The irony in my colleagues' analysis is that once they proclaim that Dai's testimony is credible, they pick and choose only those parts of his favorable testimony that support his case—not the parts that undercut it. If we must accept Dai's presentation as credible, then why not also his "real story" when confronted with the facts that he came to the United States because he wanted a good environment for his daughter, and that he did not return to China with his wife because she had a job and he did not? What becomes of his attempted cover up of the travels of his wife and daughter?

Furthermore, my colleagues' treatment of the IJ's opinion is irreconcilable with the BIA's wholesale acceptance of it. In words as clear as the English language can be, the BIA said, "We adopt and affirm the Immigration Judge's decision." To compound their error, the majority then seizes upon and pick apart the BIA's summary explanation of why it concluded on de novo review that the IJ's decision was correct. What the BIA did say was that Dai's failure to be truthful about his family's voluntary return to China was "detrimental to his claim" and "significant to his burden of proof."

# VIII

## Analysis

And so we come at last to the statutory requirement of persuasiveness, an issue uniquely suited to be determined by the "trier of fact," as the Act and 8 U.S.C. § 1158(b)(1)(B)(ii)

dictate. The majority opinion freights this inquiry with an incomplete record. The opinion sweeps demeanor, candor, and plausibility considerations—as well as the IJ's extensive findings of fact—off the board. Once again, the opinion ignores *Huang*, a post-Act case.

> The need for deference is particularly strong in the context of demeanor assessments. Such determinations will often be based on non-verbal cues, and "[f]ew, if any, of these ephemeral indicia of credibility can be conveyed by a paper record of the proceedings and it would be extraordinary for a reviewing court to substitute its second-hand impression of the petitioner's demeanor, candor, or responsiveness for that of the IJ."

744 F.3d at 1153 (alteration in original) (quoting *Jibril*, 423 F.3d at 1137).

Here, the IJ determined that Dai's testimony was not persuasive based on demeanor, non-verbal cues, and other germane material factors that went to the heart of his case. The IJ explained his decision in exquisite detail, and our approach and analysis should be simple. In order to reverse the BIA's conclusion that Dai did not carry his burden of proof, "we must determine 'that the evidence not only *supports* [a contrary] conclusion, but *compels* it—and also compels the further conclusion' that the petitioner meets the requisite standard for obtaining relief." *Garcia-Milian v. Holder*, 755 F.3d 1026, 1031 (9th Cir. 2014) (alteration in original) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992)). If anything, this record compels the conclusion that the IJ and the BIA were *correct*, not mistaken. Are my

colleagues seriously going to hold that an IJ cannot take universally accepted demeanor, candor, responsiveness, plausibility, and forthrightness factors into consideration in assessing persuasiveness, as the IJ did here?  And that this detailed record, which is full of Dai's admissions of an attempted coverup, *compels* the conclusion that Dai was so persuasive as to carry his burden?  Dai accurately understood the damaging implications of his wife's return to China.  So did the IJ and the BIA.  As the BIA stated, the truth is "inconsistent with his claims of past and feared future persecution."

## IX

### The More Things Change, The More They Stay The Same

In *Elias-Zacarias*, 921 F.2d 844 (9th Cir. 1990), *rev'd*, 502 U.S. 478 (1992), our court substituted the panel's interpretation of the evidence for the BIA's.  The Supreme Court reversed our decision, calling the first of the panel's two-part reasoning "untrue," and the second "irrelevant." 502 U.S. at 481.  The Court warned us that we could not reverse the BIA unless the asylum applicant demonstrates that "the evidence he presented was *so compelling that no reasonable factfinder could fail to find the requisite fear of persecution*." *Id.* at 483–84 (emphasis added).  In our case, we again fail to follow this instruction.

In *INS v. Orlando Ventura*, 537 U.S. 12, 13 (2002) (per curiam), the Court noted that both sides, petitioner and respondent, had asked us to remand the case to the BIA so that it might determine in the first instance whether changed conditions in Guatemala eliminated any realistic threat of

persecution of the petitioner. Our panel did not remand the case, evaluating instead the government's claim of changed conditions by itself and deciding the issue in favor of the petitioner. *Id.* at 13–14. The Supreme Court summarily reversed our decision, saying "[T]he Court of Appeals committed clear error here. It seriously disregarded the agency's legally mandated role." *Id.* at 17.

A mere two years after *Ventura*'s per curiam opinion, we knowingly made the same mistake in *Thomas v. Gonzales*, 409 F.3d 1177 (9th Cir. 2005) (en banc), *vacated*, 547 U.S. 183 (2006). We disregarded four dissenters to that flawed opinion, who argued in vain that our court's decision was irreconcilable with *Ventura*. In short order, the Supreme Court vacated our en banc opinion, saying that our "error is obvious in light of *Ventura*, itself a summary reversal" and that the same remedy was once again appropriate. 547 U.S. at 185.

With all respect, the majority opinion follows in our tradition of seizing authority that does not belong to us, disregarding DHS's statutorily mandated role. Even the REAL ID Act has failed to correct our errors.

Thus, I dissent.